The VITA–FOOD CORPORATION, Petitioner,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent.

No. 14689.

United States Court of Appeals Ninth Circuit.

Aug. 7, 1956.

360

George T. Altman, Beverly Hills, Cal., for petitioner.

H. Brian Holland, Asst. Atty. Gen., Harry Marselli, Meyer Rothwacks, Ellis N. Slack, Lee A. Jackson, Attys., Dept. of Justice, Washington, D. C., for respondent.

Before STEPHENS, FEE and CHAMBERS, Circuit Judges.

JAMES ALGER FEE, Circuit Judge.

This was a proceeding in the Tax Court for redetermination of deficiencies in income, declared value excess profits, and excess profits taxes of Vita-Food Corporation for its taxable year ending October 31, 1943.

The fact situation is quite complex. Vita-Food is a California corporation formed November 28, 1940, at the instance of Maxwell H. Lewis. Before the occasion arose for its creation, Lewis had become acquainted with Dr. Henry Borsook, of the California Institute of Technology, and in 1939 was one of a group working under the latter in an analysis of the nutritional requirements of a national defense program. After completing this work, Lewis went into the business of manufacturing vitamins. By the aid of Dr. Borsook and with the

formulae and standards of the latter, he produced a single mixed product, containing in each dose all the known vitamin and mineral requirements of the human body, which would sell at approximately one-tenth of the then current prices for individual vitamins. His ultimate purpose was to sell such products in as large a quantity and with as wide a distribution as possible. At that time, there was no trade name given to the products. The only labels consisted of numbers and letters.

Manufacturing was at first done at the California Institute of Technology and subsequently at the home of a Dr. Ellis. Although Dr. Borsook was much interested in the development of this commercial project, he refused to make any personal profit out of it because of his position with the Institute.

Lewis purchased all of the materials necessary for the manufacture of these vitamins, and paid all those who were working in the manufacture thereof. He also gave Dr. Borsook between $5,000.00 and $6,000.00, which the latter divided according to his policy between the Institute and his assistants. Lewis then attacked the problem of sales and distribution of the vitamins, which was of stellar importance. During the summer and fall of 1940, Lewis did quite a bit of business in distributing these vitamins under the trade name of "Buoyant B" through a marketing agent, but the lack of skill and of a large selling organization convinced Lewis that someone with more capital and a broader outlook would be required to market successfully the product. In the fall of that year, Lewis entered into negotiations with Arthur Hanisch, who had the requisite capital, and as a result there was an agreement in general terms for the exclusive distribution of these vitamins by the latter. The sale under the name of "Buoyant B" was discontinued, since it was apparently believed not sufficiently catching. It was agreed that title to any trademark under which the vitamins were sold should be held by Lewis. Upon recommendation of Dr. Borsook that he "would regard Mr.

Lewis' management of the enterprise as one of the prerequisites necessary to assurance of marketing practices and prices which are in the public interest," the latter kept almost complete control over the enterprise.

In order to consummate the transaction agreed upon, Vita-Food Corporation was organized. The details of the basic agreement between Lewis and Hanisch were incorporated in written form between Vita-Food, the new corporation and Hanisch on February 4, 1941. On that date, stock was issued by the corporation, and Lewis sold to Vita-Food for $78,200.95 non-exclusive manufacturing rights in the formulae and products which Lewis had developed and the good will attaching thereto and the business which Lewis had been conducting. The language as to the latter is important:

"Manufacturing rights in and to the liquid vitamin concentrate products known and to be trademarked as 'Vitall' and under such other name or names as * * * [the taxpayer] may designate and adopt from time to time, including the right to use the formulas therefor for liquid and tablet products, together with all Good Will attached to said liquid vitamin concentrate products and heretofore acquired by * * * [Lewis] in connection with his business heretofore done under his own name and under the name of General Vitamin Company."

Also, on that day Hanisch confirmed and accepted a summarization by Lewis which contained the following proviso:

"It is also understood that the style of the label to be used on the package is to be selected by you, but to remain the property of this Corporation at all times. However, should the sales trial period be successful, and your organization determine to continue and enlarge its operations, the label chosen by you shall be restricted to the use of your organization alone, during such time as you continue to distribute this concentrate."

It will be noted that in reality this was a deal between Hanisch and Lewis and that all these things happened on February 4, 1941. The description of "single" and "whole" package, used in the record, was not inept for all of these moves for consummation of the deal. Lewis says he was acting "as best I knew how without assistance."

The trade name, "The Stuart Formula," first is noted in the record on March 7, 1941. It was adopted for the purpose of a catchy advertising slogan or title for the products previously manufactured and sold by Lewis. This was in accordance with the intent of the writings above. A written contract between Vita-Food and The Stuart Company, a corporation formed and controlled by Hanisch confirmed the ownership of all trade names by the former. Vita-Food copyrighted "The Stuart Formula" as one of these trademarks on June 23, 1942, in California, and on September 8, 1942, in the United States Patent Office. As a part of this contract, Vita-Food conveyed to two corporations formed for this purpose and controlled by Hanisch what approximated the exclusive right to sell and distribute all the products theretofore manufactured and sold by Lewis. The two corporations agreed not to handle products other than those produced by Vita-Food.

A conflict between Hanisch and Lewis arose later when Hanisch wished a stock interest in Vita-Food, and Lewis refused. There was litigation between the corporations over the contract and the attempted cancellation thereof. As a result, all was resolved by a sale by Vita-Food to The Stuart Company of its trademark "The Stuart Formula" and the good will connected with the business for $200,000.00.

There are four distinct questions which are for consideration arising out of the opinion of the Tax Court disallowing the claims of Vita-Food: (a) Did the Tax Court have jurisdiction to determine whether the Commissioner disallowed a portion of the compensation actually paid Lewis for the fiscal year ended October 31, 1942? (b) Did the Tax Court determine properly that the amount which taxpayer claimed as a deduction for compensation of Lewis during the years in question was unreasonable and not in fact payment for personal services actually rendered? (c) Was the determination of gain on good will and trademark sold by Vita-Food to The Stuart Company on November 28, 1942, included in the cost to Vita-Food of the good will it purchased from Lewis on February 4, 1941? and (d) Was $75,000.00 out of the total of $200,000.00 received by Vita-Food from The Stuart Company under a settlement agreement entered into November 28, 1942, a capital gain because received for the good will and trademark sold under the agreement to The Stuart Company or ordinary income paid to Vita-Food for cancellation of the distributorship contract between these corporations?

The Tax Court made a determination of the taxes for the year ending October 31, 1943. In this process it was necessary to consider the carry-backs from the year ending October 31, 1944. Although logically it would be necessary to make a determination of the net income for the year ending October 31, 1942, including the amount allowable as a deduction for the salary of Lewis for that year, the Tax Court ruled it had no jurisdiction to make the later computation.

This is at best a highly technical pleading point. No deficiency had been assessed for that year. The notice which was sent to the taxpayer on September 16, 1952, showed an overassessment. But no services by Lewis after 1942 were involved in the amounts disallowed by the Commissioner. A great deal of evidence of the services rendered by him in the years 1941 and 1942, as found by the Tax Court, was entirely uncontradicted. It is vociferously urged that the taxpayer alleged in its petition that the income and excess profits taxes for the fiscal year ending October 31, 1942, were in con-

troversy and assigned as error the erroneous disallowance of the compensation of officers, including Lewis, for that period. It is pointed out also that the petition expressly prayed for a determination that the taxpayer had overpaid its taxes for the fiscal year ending October 31, 1942. Although it was in this context that the Tax Court was asked to consider the compensation for that period, jurisdiction was conferred by the statute to adjudicate the reasonableness of the compensation of Lewis for the fiscal year 1942 in order to compute the amount of the fiscal year loss carry-back which was applicable.

The brief of the Commissioner suggests that this issue "was conceivably lurking in the background" but not "actually projected" in the Tax Court. But it was an inherent part of the complex issue which that tribunal was necessarily required to adjudicate. There is then no encouragement to be given to the Tax Court to adopt rigidities which savor of the most technical days of the common law.

Since the issue was not considered in that form, the cause should be remanded to find the facts and make appropriate recomputations thereon.

■ The first question as to jurisdiction has thus been determined in favor of Vita-Food. The second question relates to the reasonable amount of compensation. The Tax Court did not make, as to part of this proposition, definitive findings of fact, but simply affirmed the determination of the Commissioner. Since the cause must be remanded, the Tax Court will eventually make findings upon these matters. This Court does not attempt therefore to set reasonable compensation for the years in question. There are intimations in the opinion which are clearly erroneous. Lewis was the founder of the corporation and continued to be its heart and soul during the period involved. His ideas controlled not only manufacture, but distribution of the product. He obtained Hanisch to finance and to furnish the organization for national distribution.

Even in the final year in question, he steered this corporation through the difficulties of conflict with Hanisch and the distributing corporation and consummated a sale of the formula and the trade name. The Tax Court itself found Vita-Food, in the three year period ending October 31, 1943, had a surplus of $62,523.87 after paying Lewis all the compensation which he received and all other charges including all federal taxes. This retained income would constitute an average of sixty-six per centum per year over this period on its maximum invested capital of $33,152.00, although no dividend was actually paid. The record seems to show, if it had not been for Lewis, there would have been little or no earnings. The final sale upon which he was paid special compensation was an achievement above and beyond the ordinary duties even of a manager. The circumstances set out by the Tax Court justifying the disallowance weigh little against these factors. The disallowance on the basis thereof would, in our opinion, be clearly erroneous.

■ As to the third proposition, there is also a question of fact. The Commissioner originally allowed $19,585.24, but by his amended answer he asked the court to disallow this also. The Tax Court did so. This last move seems to this Court a punishment to the taxpayer for asking review. Any findings which support disallowance of a substantial portion of this claim of $78,340.95 are clearly erroneous. The Tax Court should consider the facts on the record that Lewis had an actual going business and was manufacturing and distributing. The fact that he dropped the original trade name of "Buoyant B" and permitted Vita-Food to adopt a new trademark, into which the whole effort eventually merged, has little to do with the situation. It was still his business and his contracts with scientists and capitalists which gave a substantial good will to the products marketed.

■ Likewise, the determination that $75,000.00 should be considered as ordinary income and not as capital assets is

apparently based upon the idea that there was a release from a burdensome contract. This may have been true so far as The Stuart Company was concerned, but Vita-Food simply sold certain articles and good will. The fact that there was a contract was not burdensome to it. In fact, the Tax Court has pointed out that it has made no profits since the time of the sale and cancellation. This question should be reexamined in the light of the holding. In its present form, so far as it involves a question of fact, the holding was clearly erroneous.

Remanded for further consideration.