1142

HOME INTERIORS & GIFTS, INC., ET AL.,[1] PETITIONERS v.
COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 9007–77, 9573–78, 9574–78, 9697–78.     Filed March 24, 1980.

*Sam G. Winstead, M. Douglas Adkins*, and *Anderson Wallace,
Jr.*, for the petitioners.
*Frank C. Hider, Jr.*, for the respondent.

SIMPSON, *Judge:* The Commissioner determined the following
deficiencies in the petitioners' Federal income taxes:

| Year | Home Interiors & Gifts, Inc. | David M. and Mary C. Crowley | Donald J. and Linda J. Carter |
|------|------|------|------|
| 1971 | $365,971.00 | --- | --- |
| 1972 | 679,650.22 | --- | --- |
| 1973 | 920,490.00 | --- | --- |
| 1974 | 1,269,506.00 | $176,555 | $135,399.72 |
| 1975 | 1,021,321.00 | 127,951 | 137,980.08 |

The only issue to be decided is whether the amounts paid by
Home Interiors & Gifts, Inc., to three of its officers, constituted
reasonable compensation for services rendered within the mean-
ing of section 162(a)(1) of the Internal Revenue Code of 1954.[2]

## FINDINGS OF FACT

Some of the facts have been stipulated, and those facts are so
found.
The petitioner, Home Interiors & Gifts, Inc. (Home Interiors),

---

[1]Cases of the following petitioners are consolidated herewith: Donald J. and Linda J. Carter, docket
No. 9573–78; David M. Crowley and Mary C. Crowley, docket No. 9574–78; Home Interiors & Gifts,
Inc., docket No. 9697–78.

[2]All statutory references are to the Internal Revenue Code of 1954, as in effect during the years in
issue.

a Texas corporation, had its principal place of business in Dallas, Tex., at the time of filing its petitions in this case. It filed its corporate Federal income tax returns for 1971 through 1975 with the Internal Revenue Service Center, Austin, Tex. The petitioners, Donald J. and Linda J. Carter, husband and wife, maintained their legal residence in Coppell, Tex., at the time of filing their petition. They filed their joint Federal income tax returns for 1974 and 1975 with the Internal Revenue Service Center, Austin, Tex. The petitioners, David M. and Mary C. Crowley, husband and wife, maintained their legal residence in Dallas, Tex., at the time of filing their petition, and they too filed their joint Federal income tax returns for 1974 and 1975 with the Internal Revenue Service Center, Austin, Tex.

Home Interiors was formed by Mrs. Crowley in December 1957. Since its formation, it has been engaged solely in the direct sale of home decorations and accessories by use of the "hostess plan." Under the hostess plan, products are not sold in stores or through catalogs, but are taken directly to the homes of cooperating hostesses, who invite other potential customers to see the display. Under this plan, the sales representative, known as a displayer, is an independent contractor, who buys at wholesale from Home Interiors and sells at retail to earn a profit. Home Interiors has never engaged in significant manufacturing of its products.

Mrs. Crowley became familiar with hostess plan selling while working as a displayer for another hostess plan seller, Stanley Home Products, from 1949 through 1954. Prior to 1949, she had worked as an office manager and accountant for a furniture distributor. In 1954, she left Stanley Home Products to join a newly formed company, World Gifts, Inc. At the time, World Gifts had virtually no sales force, but in less than 4 years, Mrs. Crowley helped to build a force of 450 persons. She was vice president and general manager, and she wrote the company sales manuals and introduced the sales methods adopted by the company.

In 1957, Mrs. Crowley left World Gifts and founded Home Interiors. With $41,400 of capital raised from family and friends and drawn from her own funds, the company began operations. The initial board of directors consisted of Mrs. Crowley and her husband and Glenn C. Amon and his wife. Mrs. Crowley was elected president and was manager of national sales. Mr. Amon

was elected vice president and treasurer and served as general manager in charge of all in-house responsibilities. Mr. Amon left the company in 1962, and his stock was repurchased by the company.

Mrs. Crowley remained in the positions of president and national sales manager through the years in issue. As president, she set company policy and philosophy. She conceived of Home Interiors as a company which would assist the American woman in beautifying her home (the company directed its sales efforts solely to women). Displayers were trained not just to sell, but also to offer decorating assistance and to act as a friend to the homemaker. Mrs. Crowley also believed that the displayers should benefit as much from their efforts as the customers. She sought to project an image of Home Interiors as a company where a woman (all displayers, too, were women) could earn substantial income, yet set her own hours, maintain a family, perform rewarding work, and gain self-esteem. Mrs. Crowley strived, above all, to ensure all displayers the opportunity to earn substantial income, and to that end, she made it a policy never to cut the commission for those displayers who became managers, paid on commission, no matter how successful the manager became.

As national sales manager, Mrs. Crowley was responsible for building a force of displayers and managers and for producing sales. She wrote company sales materials and instituted sales promotions and incentives; for example, each year, as a sales promotion, there was a temporary reduction in wholesale prices which enabled displayers to earn higher profits, and there were many prizes (such as vacation trips and mink coats) for special accomplishments. Her most important contribution involved constant meetings and seminars with displayers and managers; in fact, she spent approximately half her time away from Dallas in this endeavor. Each displayer and manager attended one or two 1-day "rallies" each year. At each rally, attended by 300 to 1,000 persons, Mrs. Crowley delivered a motivation talk, recognized special achievements, and attempted to meet or shake hands with every person. Each year, Mrs. Crowley also held 2½-day regional seminars and a 1-day "Displayer's Day" in Dallas, where she awarded prizes and gave educational and motivational talks to top displayers.

It was essential for Mrs. Crowley to recruit, train, and

motivate a group of managers. She drew her managers from the ranks of displayers; a displayer, if Mrs. Crowley determined that she was a leader, became a manager by recruiting new displayers to Home Interiors. Initially, a manager was in charge of a unit, which consisted of at least 20 displayers; but by recruiting more displayers, she could become a senior manager in charge of three or more units, a branch manager in charge of five or more units, or an area manager in charge of the branches in an area of the country. Managers were full-time employees of Home Interiors and were compensated on the basis of commissions on sales made by displayers under them. Because a manager's position depended on the number of displayers under her and because her commissions depended on the sales of those displayers, there were strong incentives for managers to continue to recruit additional displayers. Mrs. Crowley believed that with these incentives her managers could be relied upon to handle to a large extent the recruiting and motivating of displayers, provided she was able to recruit and train able managers and work closely with them. Accordingly, Mrs. Crowley personally selected each manager and trained her during a 4-day retreat. Mrs. Crowley also conducted retreats and conventions for established managers, rendered advice and encouragement to them individually between formal functions, and personally reviewed their performance.

In carrying out her duties, Mrs. Crowley worked long hours, including Saturdays and Sunday afternoons. She was available to offer her assistance to managers and displayers at almost any time of the day, and she maintained an office in her home.

Mrs. Crowley was principally responsible for Home Interiors' success. By the end of the first year of operations, she had recruited 400 to 500 displayers; by the end of 1975, the number of displayers had increased to 17,733. The assembling of this sales force was primarily the result of her successful efforts to train an able force of managers, who proved capable of recruiting large numbers of displayers. Also, Mrs. Crowley's policies, such as the many incentives she instituted and her continual rallies and seminars, produced loyal and motivated displayers and, consequently, a very low turnover rate.

In January 1963, Mr. Carter, who is Mrs. Crowley's son, joined Home Interiors. He had been with the company as warehouse manager during its first year of operation, but he had left to

complete his education. After earning his degree in electrical engineering, he worked with IBM as an engineer and later as a field manager. Upon returning to Home Interiors, Mr. Carter assumed the duties of general manager, and in 1969, he was named executive vice president. Primarily, he was responsible for the design, purchase, distribution, and pricing of merchandise, and he ran the warehouse and distribution centers. During the years in issue, the Home Interiors product line consisted of about 500 items, with about 50 of the items being replaced each year. In order to reduce risks and increase the flexibility of the product line, Mr. Carter maintained the merchandising policy that every item in the line should have more than one use; for example, a planter might also be a light fixture. As the business of Home Interiors grew spectacularly, its warehouse and distribution centers also increased, and by 1975, the total space occupied by such facilities was approximately 300,000 square feet.

Mr. Carter also served as treasurer and controller of Home Interiors. In that capacity, his duties included managing the investment portfolio of the company profit-sharing plan .and designing and, until about 1974, supervising the operation of the company computer system. In addition, Mr. Carter assisted Mrs. Crowley in conducting some of the rallies and seminars and in devising promotions and incentives. As did Mrs. Crowley, Mr. Carter worked long hours.

The extraordinary success of Home Interiors was in part attributable to Mr. Carter. Through efficient control of the warehouse, he was able to turn over inventory as often as 15 or 16 times per year, with the result that operating capital requirements were unusually low. He also proved highly successful in establishing good relations with suppliers, in choosing products that sold well, and in distributing the products to the displayers.

In 1968, Home Interiors hired Andrew J. Horner as vice president for administration. Mr. Horner, who was unrelated to Mrs. Crowley and Mr. Carter, had been a regional distribution manager with Xerox Corp. and a field sales administrator with S. C. Johnson & Son, Inc. With Home Interiors, he was charged with the supervision of personnel matters involving the employees in the warehouse and offices, office services, order processing, and credit and collections. He was also called upon, as

administrative officer, to formalize the practices and procedures which Home Interiors had developed in its first decade. Thus, Mr. Horner spent much of his time preparing personnel manuals and writing communiques to personnel outlining company policies and practices. Finally, Mr. Horner served as an assistant to Mr. Carter, and consequently, exercised some responsibility for warehouse operation.

From 1968, when Mr. Horner was hired, through 1973, Mrs. Crowley, Mr. Carter, and Mr. Horner were the only executive officers of Home Interiors. In 1974, another officer was employed but the duties of the other three officers continued virtually unchanged.

From 1971 through 1975, Home Interiors achieved a return of approximately 49 percent per year on the stockholders' equity in the company. From its formation in 1958, its sales and earnings have grown as follows:

| Year | Gross sales | Earnings before taxes | Earnings after taxes |
|------|-------------|-----------------------|----------------------|
| 1958 | $518,203 | $27,531.00 | $18,299 |
| 1959 | 738,385 | 23,737.00 | 16,280 |
| 1960 | 829,309 | 12,245.00 | 8,059 |
| 1961 | 910,533 | 14,666.00 | 9,561 |
| 1962 | 1,169,633 | 19,440.00 | 13,036 |
| 1963 | 1,241,719 | 2,652.00 | 1,140 |
| 1964 | 1,242,011 | 21,133.51 | 16,068 |
| 1965 | 1,457,360 | 9,839.00 | 7,275 |
| 1966 | 1,826,297 | 11,676.00 | 8,280 |
| 1967 | 2,630,186 | 36,527.00 | 19,664 |
| 1968 | 4,284,456 | 117,436.00 | 60,094 |
| 1969 | 7,623,337 | 414,556.00 | 198,594 |
| 1970 | 12,100,074 | 1,268,654.00 | 645,084 |
| 1971 | 21,069,107 | 2,369,755.00 | 1,235,040 |
| 1972 | 34,344,067 | 4,599,270.00 | 2,393,760 |
| 1973 | 49,554,228 | 6,431,204.00 | 3,386,861 |
| 1974 | 71,160,232 | 8,054,746.00 | 4,105,409 |
| 1975 | 97,583,835 | 12,739,821.00 | 6,858,947 |
| 1976 | 141,912,127 | 23,418,981.00 | 12,175,105 |
| 1977 | 168,944,103 | 27,330,113.00 | 14,416,901 |

From 1968 through 1975, gross sales increased almost 23 times, pre-tax earnings rose about 108 times, and after-tax earnings rose more than 114 times. During such period, the average

yearly increase in gross sales was about 57 percent, in pre-tax earnings, 109 percent, and in after-tax earnings, 110 percent.

The success of Home Interiors is also illustrated by a comparison of its growth in sales and in earnings before taxes from 1964 through 1975 with the increases in the gross national product and the Standard and Poor's indexes of retail sales and corporate profits for the same period. See graph on p. 1149. While the GNP and retail sales were up about 2.4 times from 1964 through 1975 and corporate profits were up 1.8 times, Home Interiors' sales increased more than 79 times and its profits more than 600 times.

Home Interiors paid the following amounts of dividends from 1958 through 1975:

| Year | Cash dividends | Year | Cash dividends |
|------|----------------|------|----------------|
| 1958 | $3,856 | 1967 | $10,844 |
| 1959 | 4,248 | 1968 | 17,800 |
| 1960 | 4,555 | 1969 | 20,399 |
| 1961 | 4,426 | 1970 | 27,988 |
| 1962 | 4,516 | 1971 | 63,549 |
| 1963 | 0 | 1972 | 1,800,274 |
| 1964 | 4,292 | 1973 | 313,863 |
| 1965 | 9,100 | 1974 | 470,495 |
| 1966 | 9,235 | 1975 | 544,895 |

As the table indicates, dividends rose sharply in the 1970s: In fact, the average amount of dividends paid during the years in issue was about 37 times the average paid during the previous 5 years. The dividends per share also rose sharply: Home Interiors stock had a par value of $1 per share and originally sold for that amount, and the dividend per share was 10 cents in 1969, $1 in 1973, and $1.80 in 1975.[3] In addition, an extra dividend of $5.53 per share was paid in 1972. However, the percentage of after-tax earnings distributed as dividends was actually lower during the years in issue than in prior years. Partly for this reason, retained earnings grew from $864,445 at the close of 1970 to $15,333,203 at the close of 1975, and the book value of Home Interiors stock was $1.27 per share at the end of 1969, $10.39 at the end of 1973, and $26.62 at the end of 1975.

---

[3] In 1973, Home Interiors declared a 1-to-1 stock dividend. We have doubled the amounts of dividends paid per share in 1973 and 1975 to reflect such stock dividend.

*Percentage Increase 1964–1975*

60,000

10,000

9,000

8,000

7,000

6,000

5,000

4,000

3,000

2,000

1,000

500

| GNP | Retail sales | Corporate profits | Home Interiors' |  |
|-----|--------------|-------------------|-----------------|--|
|     |              |                   | Sales | Profits before taxes |

In each of the years from 1971 through 1975, Mrs. Crowley owned approximately 27 percent of the outstanding stock of Home Interiors; Mr. Carter owned 19 percent; and they and their families together owned slightly more than 50 percent of such stock. During such years, Mr. Horner owned less than 1 percent of such stock. The board of directors for such years included Mr. and Mrs. Crowley, Mr. Carter, Mr. Horner, and five persons not related to them by blood or marriage.

The compensation of Mrs. Crowley, Mr. Carter, and Mr. Horner was set for each year of employment by the board of directors at its annual meeting for that year, usually held in May. When Home Interiors was founded, the board decided that Mrs. Crowley and Mr. Amon should each receive a commission of 2.5 percent of sales. From 1958 through 1972, the board approved of paying Mrs. Crowley a basic salary of $300 per month plus 2.5 percent of either gross or wholesale sales.[4] In 1973, her commission was reduced to 2 percent, and in 1975, to 1.1875 percent. In addition, she received a bonus in most years, usually of 10 percent of commissions, and there was a contribution on her behalf to the employees' profit-sharing plan equal to 15 percent of all nondeferred compensation. Mr. Carter and Mr. Horner were compensated similarly. However, Mr. Carter's salary was $200 per month and, for 1963 through 1973, his commission was 2 percent; his commission was reduced to 1.75 percent in 1974 and to 1.1875 percent in 1975. Mr. Horner's salary was $1,000 per month and his commission was 0.25 percent. The company paid all the expenses incurred by the three officers in performing their duties.

Mrs. Crowley, Mr. Carter, and Mr. Horner received the following amounts of compensation during the years in issue:

| | 1971 | 1972 | 1973 | 1974 | 1975 |
|---|---|---|---|---|---|
| | | *Mary C. Crowley* | | | |
| Salary | $3,600.00 | $3,600.00 | $3,600.00 | $3,600 | $3,600 |
| Commission | 445,194.92 | 737,701.50 | 854,006.78 | 1,229,117 | 987,196 |
| Bonus | 44,879.48 | 73,770.15 | 85,760.68 | 123,272 | --- |
| Total | 493,674.40 | 815,071.65 | 943,367.46 | 1,355,989 | 990,796 |
| Profit-sharing | 72,689.89 | 120,383.34 | 139,472.13 | 200,766 | 146,227 |
| Total | 566,364.29 | 935,454.99 | 1,082,839.59 | 1,556,755 | 1,137,023 |

---

[4]Wholesale sales was a figure slightly less than gross sales.

|  | Donald J. Carter |  |  |  |  |
|---|---|---|---|---|---|
| Salary | $2,400.00 | $2,400.00 | $2,400.00 | $2,400 | $2,400 |
| Commission | 359,641.55 | 590,161.20 | 854,006.78 | 1,075,478 | 987,196 |
| Bonus | 36,204.45 | 59,016.12 | 85,640.68 | 107,788 | --- |
| Total | 398,246.00 | 651,577.32 | 942,047.46 | 1,185,666 | 989,516 |
| Profit-sharing | 58,595.30 | 96,206.43 | 139,191.71 | 175,510 | 146,153 |
| Total | 456,841.30 | 747,783.75 | 1,081,239.17 | 1,361,176 | 1,135,749 |
|  | Andrew J. Horner |  |  |  |  |
| Salary | $12,000.00 | $12,000.00 | $12,000.00 | $12,000 | $12,000 |
| Commission | 44,519.40 | 73,769.90 | 106,750.85 | 153,640 | 208,012 |
| Bonus | 5,651.94 | 8,576.99 | 11,875.09 | 17,984 | 21,910 |
| Total | 62,171.34 | 94,347.00 | 130,625.94 | 183,624 | 241,922 |
| Profit-sharing | 9,161.48 | 13,960.19 | 19,348.99 | 27,238 | 36,032 |
| Total | [5]71,232.48 | [5]108,307.69 | 149,974.93 | 210,862 | 277,954 |

In the years prior to 1971, Mrs. Crowley, Mr. Carter, and Mr. Horner received the following amounts of nondeferred compensation: [6]

| Year | Mrs. Crowley | Mr. Carter | Mr. Horner |
|---|---|---|---|
| 1958 | $12,955 | --- | --- |
| 1959 | 18,460 | --- | --- |
| 1960 | 20,732 | --- | --- |
| 1961 | 22,766 | --- | --- |
| 1962 | 27,467 | --- | --- |
| 1963 | 31,149 | $18,629 | --- |
| 1964 | 31,048 | 18,629 | --- |
| 1965 | 42,064 | 31,138 | --- |
| 1966 | 45,652 | 42,522 | --- |
| 1967 | 85,659 | 66,125 | --- |
| 1968 | 114,084 | 78,229 | $26,111 |
| 1969 | 204,775 | 163,292 | 33,249 |
| 1970 | 331,196 | 265,829 | 45,276 |

Although the nondeferred compensation paid to the officers of Home Interiors increased greatly over the years, such compensation represented a sharply declining percentage of the pretax earnings of the company during the years 1968 through 1975:[7]

---

[5]These totals were stipulated to by the parties. However, the parties apparently made some mathematical errors in their computations since the total nondeferred compensation and profit-sharing contributions do not come to these totals, but on the record, we do not know what figures are correct.

[6]Profit-sharing contributions for years prior to 1971 are not in the record.

[7]Profit-sharing contributions have not been included in this table since the amounts of such contributions prior to 1971 are not in the record. With profit-sharing contributions included, all the percentages would be higher, but their decline from 1968 through 1975 would be even sharper.

| Year | Mrs. Crowley | Mr. Carter | Mr. Horner |
|------|------|------|------|
| 1968 | 97% | 67% | 22% |
| 1969 | 49 | 39 | 8 |
| 1970 | 26 | 21 | 4 |
| 1971 | 21 | 17 | 3 |
| 1972 | 18 | 14 | 2 |
| 1973 | 15 | 15 | 2 |
| 1974 | 17 | 15 | 2 |
| 1975 | 8 | 8 | 2 |

The area and branch managers were also well compensated; during the years in issue, they received the following commissions:

| | 1971 | 1972 | 1973 | 1974 | 1975 |
|------|------|------|------|------|------|
| *Area Managers* | | | | | |
| Number of individuals | 3 | 4 | 4 | 5 | 5 |
| Total commissions | $310,000 | $475,000 | $602,000 | $875,000 | $1,128,000 |
| High individual | 124,000 | 159,000 | 196,000 | 247,000 | 295,000 |
| Average | 103,000 | 119,000 | 150,000 | 175,000 | 226,000 |
| *Branch Managers* | | | | | |
| Number of individuals | 16 | 21 | 20 | 23 | 24 |
| Total commissions | $704,000 | $1,222,000 | $1,702,000 | $2,162,000 | $3,238,000 |
| High individual | 91,000 | 117,000 | 157,000 | 219,000 | 271,000 |
| Average | 59,000 | 72,000 | 95,000 | 103,000 | 141,000 |

The managers received no additional compensation from Home Interiors, and out of their commissions, they were required to pay most of their own business expenses. The expenses incurred by the managers varied widely, but such expenses on the average did not exceed one-third of commissions.

In the years 1972 and 1974, the five highest paid executives of public U.S. companies received, according to Forbes surveys (May 15, 1973; May 15, 1975), the following amounts of compensation, including salary, bonuses, and deferred amounts:

| Company | 1972 | Company | 1974 |
|------|------|------|------|
| General Motors ..... | $875,000 | ITT ................... | $791,000 |
| Ford Motor.......... | 875,000 | Exxon ............... | 704,000 |
| Johnson & Johnson .............. | 874,000 | Mobil Oil ............ | 612,000 |
| ITT .................... | 813,000 | American Home Products........... | 600,000 |
| Chrysler .............. | 639,000 | American Broadcasting ...... | 583,000 |

In the same years, the chief executive officers of 10 large

retailing concerns received, according to Forbes surveys (May 15, 1973; May 15, 1975), the following compensation, including salary, bonuses, and deferred amounts:

| Company | 1972 | 1974 |
|---|---|---|
| J. C. Penney | $551,000 | $154,000 |
| Sears Roebuck | 478,000 | 344,000 |
| May Department Stores | 304,000 | 310,000 |
| Mercantile Stores | 286,000 | 263,000 |
| Allied Stores | 275,000 | 275,000 |
| F. W. Woolworth | 271,000 | 331,000 |
| Federated Department Stores | 265,000 | 300,000 |
| S. S. Kresge | 244,000 | 265,000 |
| Associated Dry Goods | 210,000 | 220,000 |
| Marshall Field | 203,000 | 204,000 |

In 1972 and 1974, the 10 companies earned the following revenues and net profits:

| Company | Revenues | | Net profits | |
|---|---|---|---|---|
| | 1972 | 1974 | 1972 | 1974 |
| J. C. Penney | $5,530,000,000 | $6,936,000,000 | $163,000,000 | $125,000,000 |
| Sears Roebuck | 10,991,000,000 | 16,078,000,000 | 622,000,000 | 501,000,000 |
| May Department Stores | 1,478,000,000 | 1,697,000,000 | 48,000,000 | 47,000,000 |
| Mercantile Stores | 458,000,000 | 564,000,000 | 21,000,000 | 21,000,000 |
| Allied Stores | 1,496,000,000 | 1,610,000,000 | 28,000,000 | 36,000,000 |
| F. W. Woolworth | 3,148,000,000 | 4,177,000,000 | 79,000,000 | 65,000,000 |
| Federated Department Stores | 2,665,000,000 | 3,269,000,000 | 109,000,000 | 119,000,000 |
| S. S. Kresge | 3,875,000,000 | 5,612,000,000 | 115,000,000 | 105,000,000 |
| Associated Dry Goods | 1,130,000,000 | 1,300,000,000 | 43,000,000 | 37,000,000 |
| Marshall Field | 493,000,000 | 548,000,000 | 21,000,000 | 20,000,000 |

In his notices of deficiency sent to Home Interiors, the Commissioner determined that the following amounts constituted reasonable nondeferred compensation:

| Year | Mrs. Crowley | Mr. Carter | Mr. Horner |
|---|---|---|---|
| 1971 | $145,000 | $92,000 | $62,071 |
| 1972 | 159,500 | 97,520 | 65,720 |
| 1973 | 175,450 | 103,371 | 69,663 |
| 1974 | 192,995 | 109,573 | 73,843 |
| 1975 | 212,295 | 116,148 | 78,273 |

The Commissioner disallowed the deduction for nondeferred compensation in excess of such amounts and for the contributions to the profit-sharing plan attributable to such excess amounts. In his notices of deficiency sent to Mr. and Mrs.

Crowley and Mr. and Mrs. Carter, the Commissioner determined, for 1974 and 1975, that the excess amounts of nondeferred compensation did not qualify for personal service income under section 1348, relating to the maximum tax on such income.

## OPINION

The sole issue for decision is whether the amounts Home Interiors paid to Mrs. Crowley, Mr. Carter, and Mr. Horner from 1971 through 1975 constituted reasonable compensation for services rendered within the meaning of section 162(a), which, in part, provides:

(a) IN GENERAL.—There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including—

(1) a reasonable allowance for salaries or other compensation for personal services actually rendered;

The parties focused their evidence and arguments on the question of whether the compensation paid to the executive officers of Home Interiors was reasonable within the meaning of section 162(a)(1). The Commissioner conceded that the nondeferred compensation conceded by him to be reasonable could be used for purposes of the contributions to the profit-sharing plan and the application of section 1348, and the parties did not focus at all on the separate questions of whether the contributions to the profit-sharing plan are reasonable or whether the compensation paid to Mrs. Crowley and Mr. Carter should be treated as personal service income within the meaning of section 1348. Accordingly, our decision as to what amounts of compensation are reasonable within the meaning of section 162(a)(1) will be dispositive of the issues under sections 404(a)[8] and 1348; Home Interiors will be entitled to a deduction under section 404(a) for contributions to the profit-sharing plan equal to 15 percent of the compensation which we find to be reasonable for Mrs. Crowley, Mr. Carter, and Mr. Horner, and such nondeferred compensation may be treated by Mrs. Crowley and Mr. Carter as personal service income within the meaning of section 1348. See *Kennedy v. Commissioner*, 72 T.C. 793, 805–806 (1979).

---

[8]The deductibility of the nondeferred compensation is governed by sec. 162(a), and the deductibility of the deferred compensation is governed by sec. 404(a); however, under both provisions, the deduction is limited to reasonable compensation. Secs. 162(a)(1), 404(a); sec. 1.404(a)–1(b), Income Tax Regs.

The reasonable compensation provision, now appearing in section 162(a)(1), was first enacted in 1918. In 1943, Dean Griswold sought to discover the purpose of the provision. He found that there was a dearth of legislative history illuminating its purpose; he concluded that the legislative objective was to enact the limitations which had appeared in the Treasury regulations denying a deduction for payments which were in effect dividends or gifts to shareholders or their relatives. Note, 56 Harv. L. Rev. 997, 1000 (1943). However, later research led Dean Griswold to a different conclusion: He found that the language of the 1918 Act was similar to the language of earlier excess profits tax regulations and that such language had been included in such regulations to allow a deduction for reasonable compensation for officers even though no such compensation was actually paid. Thus, he concluded that the provision was not designed as a limitation on the deductibility of compensation. Note, 59 Harv. L. Rev. 286 (1945). Despite Dean Griswold's research, the law has developed otherwise. The reasonable compensation provision has uniformly been considered by the courts to be a restriction on the deductibility of compensation; nevertheless, Dean Griswold's research helps to point the way in deciding the scope of the restriction.

In deciding reasonable compensation cases, the courts have established the propositions that whether the compensation was reasonable is a question to be resolved on the basis of an examination of all the facts and circumstances of the case. *Charles Schneider & Co. v. Commissioner*, 500 F.2d 148, 151 (8th Cir. 1974), affg. a Memorandum Opinion of this Court, cert. denied 420 U.S. 908 (1975); *Pacific Grains, Inc. v. Commissioner*, 399 F.2d 603, 605 (9th Cir. 1968), affg. a Memorandum Opinion of this Court. The determination of the Commissioner is presumptively correct, and the burden of proving the reasonableness of the compensation is upon the petitioners. *Botany Worsted Mills v. United States*, 278 U.S. 282 (1929). The factors considered relevant in determining reasonableness of compensation include:

the employee's qualifications; the nature, extent and scope of the employee's work; the size and complexities of the business; a comparison of salaries paid with the gross income and the net income; the prevailing general economic conditions; comparison of salaries with distributions to stockholders; the prevailing rates of compensation for comparable positions in comparable concerns; the salary policy of the taxpayer as to all employees; and in the case of small corporations with a limited number of officers the amount of

compensation paid to the particular employee in previous years. * * * [*Mayson Mfg. Co. v. Commissioner*, 178 F.2d 115, 119 (6th Cir. 1949), revg. a Memorandum Opinion of this Court.]

See also *Commercial Iron Works v. Commissioner*, 166 F.2d 221, 224 (5th Cir. 1948), affg. a Memorandum Opinion of this Court. No single factor is decisive; rather, we must consider and weigh the totality of facts and circumstances in arriving at our decision. *Mayson Mfg. Co. v. Commissioner, supra.* Where officers-shareholders, who are in control of a corporation, set their own compensation, careful scrutiny is required to determine whether the alleged compensation is in fact a distribution of profits. *Charles Schneider & Co. v. Commissioner*, 500 F.2d at 152; *Logan Lumber Co. v. Commissioner*, 365 F.2d 846, 851 (5th Cir. 1966), affg. on this issue a Memorandum Opinion of this Court.

At trial, the Commissioner and the petitioners presented expert testimony to support their positions. The Commissioner's expert and Hay Associates which employs him are recognized experts in designing plans of executive compensation, and the expert presented a carefully prepared report and testimony on the compensation which he considered reasonable for the officers of Home Interiors. His conclusions were primarily based on a type of analysis which is known as the "Hay method." Under such method, the expert first interviewed Mrs. Crowley, Mr. Carter, and Mr. Horner to learn about the operations of Home Interiors and the roles they performed in such operations. Then, with that information, he determined, from a survey of approximately 800 companies, the highest amounts those companies paid to employees in positions requiring similar skill, responsibility, and creativity. To check the results obtained by use of the Hay method, the expert also conducted a "market price analysis" of 6 other direct selling companies and 10 other high growth companies with respect to which information was available. He computed the ratio between the compensation paid to the chief executive officers of such other companies and the sales and profits of such companies, and he applied that ratio to the sales and profits of Home Interiors. As a result, he found that the compensation which would be payable to the officers of Home Interiors under the market price analysis was substantially less than the amounts of compensation which he had found by use of the Hay method. Finally, the Commissioner's expert was

of the opinion that the following amounts represented reasonable compensation for the officers of Home Interiors:

| Year | Mrs. Crowley | Mr. Carter | Mr. Horner |
|------|--------------|------------|------------|
| 1971 | $198,000 | $159,000 | $88,000 |
| 1972 | 248,000 | 190,000 | 96,000 |
| 1973 | 268,000 | 218,000 | 108,000 |
| 1974 | 338,000 | 265,000 | 143,000 |
| 1975 | 411,000 | 293,000 | 173,000 |

In his brief, the Commissioner modified the position taken by him in the notices of deficiency and conceded that the amounts of compensation which his expert found to be reasonable for Mrs. Crowley, Mr. Carter, and Mr. Horner are reasonable nondeferred compensation within the meaning of section 162(a)(1). He also conceded that profit-sharing contributions of 15 percent of such amounts are reasonable and deductible under section 404(a).

The petitioners' experts adopted a different approach. They did not undertake to determine what specific amounts of compensation were reasonable for the officers of Home Interiors; instead, they examined the financial reports of Home Interiors, and compared the amount of compensation paid to its officers with its sales and profits. They selected 18 other companies which they considered to be comparable because those companies were of medium size and involved managers with unusual skills. When they compared the amount of earnings which Home Interiors allocated to the payment of executive compensation with the similar information of the other companies, they concluded that Home Interiors was not paying excessive executive compensation. In reaching their conclusion, the experts also pointed out that Home Interiors' performance over the years was extraordinary.

We have here a most unusual case: the amounts of compensation paid the officers of Home Interiors were very large, but their efforts produced extraordinary results for Home Interiors and everyone connected with it. However measured, the success of Home Interiors was very impressive. See *Hammond Lead Products, Inc. v. Commissioner*, 425 F.2d 31 (7th Cir. 1970), affg. a Memorandum Opinion of this Court; *Templeton, Kenly & Co. v. Commissioner*, 6 B.T.A. 61 (1927). Its gross sales in 1968 were $4,284,456 and in 1975, $97,583,835; thus, during such period, the gross sales increased almost 23 times, or at an average annual

rate of 57 percent. The after-tax earnings of Home Interiors in 1968 were $60,094 and in 1975, $6,858,947; thus, during such period, such earnings increased 114 times, or at an average annual rate of 110 percent. When the performance of Home Interiors is compared with the growth in the GNP and with sales of retail establishments generally, the results are equally impressive: in 1971 through 1975, the GNP increased about 43 percent; retail store sales generally, about 44 percent; but Home Interiors' sales, 360 percent. What is more, we are convinced that the extraordinary success of Home Interiors was no accident, nor was it merely due to the generally favorable economic conditions prevailing in the 1960's and 1970's.

Mrs. Crowley spent most of a day on the stand as a witness, and it it clear that she possesses rare talent. See *Capitol Market, Ltd. v. United States*, 207 F. Supp. 376, 378–379 (D. Hawaii 1962); *Federal Machine & Welder Co. v. Commissioner*, 11 T.C. 952, 960 (1948), affd. per curiam 184 F.2d 843 (6th Cir. 1950). The profitability of Home Interiors depended upon its sales, and after hearing her describe her policies and practices in leading Home Interiors, we can understand how she was able to recruit a sales organization of over 17,000 by 1975, why the organization was motivated to produce such exceptional results, and why there was little turnover in personnel. See *Gordy Tire Co. v. United States*, 155 Ct. Cl. 759, 296 F.2d 476 (1961). We doubt that she could have been replaced. See *Vita-Food Corp. v. Commissioner*, 238 F.2d 359, 363 (9th Cir. 1956), revg. on another issue a Memorandum Opinion of this Court.

Mr. Carter also made immense contributions to the success of Home Interiors. Its greatest increase in sales and profitability occurred from 1968 through 1977, a period beginning shortly after he assumed a significant role in managing the affairs of the company. His responsibilities were many and varied. He assisted significantly in conducting the rallies and other activities designed to inspire the sales organization, and he wisely managed the inventory and arranged for the design of products which would have a wide appeal. See *Gordy Tire Co. v. United States, supra.*

Mr. Horner's responsibilities were more limited, but his compensation was also considerably less. He was unrelated to Mrs. Crowley and Mr. Carter, and he was employed, in an arm's-length transaction, to assist them in managing the affairs of

Home Interiors. He did perform a wide variety of activities which contributed to the success of a very successful company. He had only an insignificant ownership interest in the company, and there is no reason to believe that the company would pay him more than his services were worth to it. See *California Vegetable Concentrates, Inc. v. Commissioner*, 10 T.C. 1158, 1166 (1948).

Though Mrs. Crowley, Mr. Carter, and Mr. Horner received large amounts of compensation, the other key employees of Home Interiors also received munificent compensation during the years in issue. In our findings of fact, we included information concerning the compensation of the area and branch managers. That information shows that in 1975, one area manager received $295,000 in commissions and that the average commissions received by an area manager in that year were $226,000. Similarly, the highest commissions of a branch manager in that year were $271,000, and the average for a branch manager for that year was $141,000. Although the area and branch managers were required to pay most of their business expenses out of their commissions, we have found that those expenses averaged around one-third of such commissions; thus, even when those expenses are subtracted, those managers were left with very handsome compensation. Morever, the compensation of those managers actually increased at approximately the same rate during the years in issue as did the compensation of Mrs. Crowley, Mr. Carter, and Mr. Horner: the aggregate nondeferred compensation of Mrs. Crowley, Mr. Carter, and Mr. Horner rose from $954,091.74 in 1971 to $2,223,384 in 1975—an increase of approximately 133 percent. Whereas, the average commissions of an area manager increased from $103,000 in 1971 to $226,000 in 1975—an increase of 119 percent; and the average commissions of a branch manager increased from $59,000 in 1971 to $141,000 in 1975—an increase of 140 percent.

In judging the reasonableness of the compensation received by Mrs. Crowley, Mr. Carter, and Mr. Horner, it is also significant that all key employees of Home Interiors were compensated on the basis of commissions and that the use of such method of compensation was a longstanding practice of the company. Section 1.162–7(b)(2), Income Tax Regs., provides in part:

Generally speaking, if contingent compensation is paid pursuant to a free bargain * * * before the services are rendered, not influenced by any

consideration on the part of the employer other than that of securing on fair and advantageous terms the services of the individual, it should be allowed as a deduction even though in the actual working out of the contract it may prove to be greater than the amount which would ordinarily be paid.

When Home Interiors was first organized, it decided to compensate Mrs. Crowley and Mr. Amon, its key officers at that time, primarily on the basis of commissions at $2\frac{1}{2}$ percent of sales. At such time, there was no way of knowing the amount of income that would be produced by such commissions. The company continued to pay Mrs. Crowley commissions at that rate through the years while it was experiencing modest success. The rate of her commissions was never increased; but it was decreased in 1973 and again in 1975 when Home Interiors was experiencing such extraordinary success. The rates of commissions paid to Mr. Carter and Mr. Horner were also established before Home Interiors' great success; those rates too were never increased, but the rate paid to Mr. Carter was also reduced in 1974 and again in 1975.

It is true that each year the board of directors of Home Interiors could have changed the rates of commissions paid to these officers, but in view of the sharply increasing profits of the company and in view of the fact that the other shareholders were receiving increasing benefits, the board of directors had no reason to reduce such commissions. It is also true that Mrs. Crowley and Mr. Carter, together with their families, owned slightly more than 50 percent of the stock of Home Interiors; but there were many unrelated shareholders, and together, they held a substantial block of the stock. Thus, this is not a situation in which Mrs. Crowley and her family were free to do as they wished in running the affairs of the company. Compare *Harolds Club v. Commissioner*, 340 F.2d 861 (9th Cir. 1965), affg. a Memorandum Opinion of this Court. The company was achieving earnings which must have been gratifying to all of its owners, and all of them had reason to favor continuing the arrangements which had resulted in such success.

Moreover, although the commissions actually received by Mrs. Crowley, Mr. Carter, and Mr. Horner increased greatly from 1968 through 1975, those commissions represented a sharply declining percentage of the earnings of Home Interiors. See *Capitol Market, Ltd. v. United States*, 207 F. Supp. at 381. In 1968, Mrs. Crowley's nondeferred compensation represented 97

percent of the pre-tax earnings of the company; Mr. Carter's, 67 percent; and Mr. Horner's, 22 percent. However, by 1975, Mrs. Crowley's compensation was equal to only 8 percent of the company's pre-tax earnings; Mr. Carter's, 8 percent; and Mr. Horner's, 2 percent. Thus, a declining percentage of the company's earnings was allocated to compensation of its executive officers.

Over the years, the shareholders of Home Interiors participated handsomely in its earnings. From 1971 through 1975, the average return on equity was 49 percent. From 1968 through 1975, the dividends distributed to shareholders increased dramatically: in 1968, the aggregate dividends were $17,800; in 1971, $63,549; and in 1975, $544,895. Thus, the dividends in 1975 were approximately 9 times the amount in 1971 and approximately 30 times the amount in 1968. The dividends per share increased in an equally impressive manner: in 1969, the dividends were 10 cents per share; in 1973, $1 per share; and in 1975, $1.80 per share.

We recognize that the percentage of after-tax earnings distributed as dividends declined over the years in issue. However, the decline was not the result of the payment of higher compensation to the executive officers; it resulted from a decision to retain additional earnings in the business. Such retained earnings increased from $864,445 at the close of 1970 to $15,333,203 at the close of 1975, and as a result, the book value of Home Interiors stock rose from $1.27 per share at the end of 1969 to $26.62 at the end of 1975. On this record, it is clear that an investment in the stock of Home Interiors was very attractive and that the shareholders were receiving their fair share of the profits of the business. Under such circumstances, there is no ground for concluding that the compensation paid Mrs. Crowley, Mr. Carter, and Mr. Horner represented an arrangement for them to draw off more than their fair share of the profits of the business. See *Howard Theatre Co. v. Commissioner*, 16 B.T.A. 57, 60 (1929); cf. *Long Island Drug Co. v. Commissioner*, 35 B.T.A. 328, 333–334 (1937), affd. 111 F.2d 593 (2d Cir. 1940), cert. denied 311 U.S. 680 (1940).

The testimony of the Commissioner's expert was persuasive. We were impressed by the thoroughness of his study, and we are convinced that his conclusions as to the reasonable compensation for Mrs. Crowley, Mr. Carter, and Mr. Horner represent the

norms for their services. Yet, such conclusion is not dispositive of the issue in this case. Section 162(a)(1) was not designed to regulate businesses by denying them a deduction for the payment of compensation in excess of the norm. See *Fifth Avenue Coach Lines, Inc. v. Commissioner*, 31 T.C. 1080, 1095 (1959), affd. and revd. on other issues 281 F.2d 556 (2d Cir. 1960). The payment of abnormally high compensation does warrant a careful scrutiny of the arrangement to be sure that the payments were in fact made for services actually rendered. However, in view of the extraordinary services furnished by Mrs. Crowley, Mr. Carter, and Mr. Horner, we are convinced that they earned large compensation. When their compensation is compared to that received by other employees of the company, it is clear that the compensation of the executive officers was not disproportionate. Also, when the return to shareholders in the form of dividends and appreciation in the value of their stock is examined, it is apparent that the exceptional prosperity of the company was shared with the stockholders.

It is true that the compensation received by Mrs. Crowley and Mr. Carter exceeded the compensation paid to the chief executive officers of many other corporations with much larger sales, more employees, and greater profits; but those other corporations did not experience the superb growth achieved by Home Interiors in sales, in earnings, and in return to shareholders. Moreover, in these times of unparalleled inflation, our concept of reasonable compensation must take into consideration such inflation, and as appears in the Forbes information, some other companies were also paying their chief executive officers extraordinary compensation, which might have been considered excessive in other times. Accordingly, after very careful analysis of all the facts and circumstances and careful weighing of those circumstances, we conclude and hold that the compensation paid Mrs. Crowley, Mr. Carter, and Mr. Horner in the years 1971 through 1975 was reasonable within the meaning of section 162(a)(1).

*Decisions will be entered under Rule 155.*