EDWARD E. STONEBROOK, GERTRUDE STONEBROOK, MELVIN D. EDIGER, and ESTHER R. EDIGER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Stonebrook v. Commissioner
Docket No. 11599-78.
United States Tax Court
T.C. Memo 1980-522; 1980 Tax Ct. Memo LEXIS 60; 41 T.C.M. (CCH) 422; T.C.M. (RIA) 80522; November 25, 1980, Filed *60 Ps. who were farmers, contracted with an individual, who was related to them, to harvest their crop. In harvesting the crop, the individual furnished little or none of the required equipment and materials and essentially provided only her personal services. Ps paid her a substantial fee. Held, the Commissioner's disallowance of a deduction for a portion of the fee sustained, since Ps failed to prove that any amount greater than that allowed by the Commissioner was an ordinary and necessary business expense under sec. 162(a), I.R.C. 1954. James C. Griggs, for the petitioners. T. Keith Fogg, for the respondent. SIMPSON
MEMORANDUM FINDINGS OF FACT AND OPINION SIMPSON, Judge: The Commissioner determined the following deficiencies in the petitioners' Federal income taxes: Petitioners
1974
1975
Edward E. and Gertrude
$5,634.14
$3,238.13
Stonebrook
Melvin D. and Esther R.
9,263.00
0
Ediger
*61 The only issue for decision is whether the amounts paid by the petitioners, who were farmers, to have a crop harvested were ordinary and necessary business expenses under section 162 of the Internal Revenue Code of 1954. FINDINGS AND FACT Some of the facts have been stipulated, and those facts are so found. The petitioners, Edward E. and Gertrude Stonebrook, husband and wife, and Melvin D. and Esther R. Ediger, husband and wife, all maintained legal residences in Independence, Ore., when they filed their petition in this case. Mr. and Mrs. Stonebrook timely filed joint Federal income tax returns for 1974 and 1975, and Mr. and Mrs. Ediger timely filed a joint Federal income tax return for 1974, with the Internal Revenue Service Center, Ogden, Utah. Mr. Stonebrook and Mr. Ediger will sometimes be referred to as the petitioners. For many years prior to the years in issue, Mr. Stonebrook and Mr. Ediger were farmers. Sometime before 1972, they formed a farming corporation, S & E Farms, Inc. (S & E), and received all its stock. Through S & E, they grew blackberries, among other crops. In September 1972, Mr. Stonebrook retired from active farming, and *62 in December 1973, S & E sold its farmland but retained the right to harvest the 1974 crop of blackberries growing on the land. In May 1974, Mr. Stonebrook and Mr. Ediger informally agreed to liquidate S & E. Although a formal plan of liquidation was not adopted by S & E until June 15, 1974, in May 1974, Mr. Stonebrook received possession of two berry picking machines from S & E as a liquidation distribution. A bill of sale was executed on July 14, 1974, to evidence the transfer of such machines. Sometime before June 15, 1974, the petitioners orally contracted with Beverly Melick, now Beverly Cannon, to harvest their crop of blackberries. It was necessary for them to obtain the services of Mrs. Cannon, since Mr. Ediger had other commitments and since Mr. Stonebrook, at age 68, could no longer manage the harvest himself. Mrs. Cannon was the daughter of Mr. and Mrs. Stonebrook and the sister of Mrs. Ediger. Her experience in harvesting blackberries was limited to a single week in 1972 when she managed one of the crews picking berries for the petitioners. An independent contractor hired to harvest blackberries is known as a "custom harvester." Normally, the custom harvester has *63 complete responsibility for picking the fruit and loading it on trucks. He furnishes the picking machines as well as the laborers to operate them and the gas, oil, and spare parts to keep them running; he prepares payrolls, pays premiums for workman's compensation and other incidental expenses, and keeps his own books. For his services, a custom harvester charges a fee which varies with the aggregate weight of the crop; in 1974, a reasonable fee for the petitioners' crop was 7 cents per pound, and Mrs. Cannon agreed to supervise the petitioners' harvest for that fee. Mrs. Cannon began working for the petitioners on June 15, 1974. Initially, she spent several weeks specially preparing the blackberry plants for mechanical picking, a task normally not performed by a custom harvester. When the harvest began, Mrs. Cannon hired, supervised, and paid laborers, maintained the picking machines, and generally exercised the control over the operation that would have been exercised by a custom harvester. Yet, unlike a custom harvester, Mrs. Cannon did not provide her own berry picking machines. She needed four machines, and Mr. Stonebrook and Mr. Ediger provided all of them. One machine *64 belonged to Mr. Ediger, and it was loaned to her free of charge. A second machine, which had a rental value of $11,120 for the 1974 season, was leased by the petitioners, who paid the rental thereon and furnished it to Mrs. Cannon without charge. In addition, Mr. Stonebrook gave her, outright, his entire interest in the two pickers which he received from S & E, but on the condition that she use them in the harvest. The petitioners also provided Mrs. Cannon, free of charge, with tractors having a rental value of $1,875, gas and oil worth $398, and tools with which to repair the picking machines. Finally, Mr. Stonebrook helped to load the blackberries on trucks for Mrs. Cannon, and on a bank account on which Mrs. Cannon and he were signatories, he wrote some of the payroll checks. While the harvest was in progress, Mrs. Cannon worked 50 consecutive nights (blackberries are best picked at night) during the hours of approximately 7:00 p.m. to 10:00 a.m. In all, she worked for the petitioners for 3 months, until September 17, 1974. The only significant expense incurred by Mrs. Cannon was the cost of labor, $34,391. In addition, she incurred minor expenses for repairs and maintenance, *65 $342, and depreciation, $531. The petitioners' 1974 blackberry harvest was 1,644,970 pounds. Such crop was 170 percent larger than that of any other prior year and represented 1/25th of all the blackberries produced in the United States. Mrs. Cannon was paid $107,850, or about 6.6 cents per pound, [1] and the Stonebrooks and Edigers deducted such payments on their Federal income tax returns for 1974 and 1975. In his notices of deficiency, the Commissioner determined that such payments were unreasonable and excessive; he determined that a reasonable fee for Mrs. Cannon was $52,891.35 and disallowed the excess. OPINION The only issue to be decided is the extent to which the payments to Mrs. Cannon were deductible under section 162. That section allows a deduction for "all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business." The petitioners have the burden of proving that their payments to Mrs. Cannon satisfy the requirements of this provision. Rule 142(a), Tax Court Rules of Practice and Procedure; Welch v. Helvering, 290 U.S. 111, 115 (1933); *66 Sanford v. Commissioner, 50 T.C. 823, 826 (1968), affd. per curiam 412 F.2d 201 (2d Cir. 1969), cert. denied 396 U.S. 841 (1969). Also, since the payments were part of an intrafamily transaction, they must be scrutinized carefully to determine whether they were in fact gifts. Commissioner v. Tower,327 U.S. 280, 291 (1946); Helvering v. Clifford,309 U.S. 331, 335 (1940); Finley v. Commissioner,255 F. 2d 128, 131 (10th Cir. 1958), affg. 27 T.C. 413 (1956). The parties have stipulated that Mrs. Cannon was paid at the rate of 6.6 cents per pound and that 7 cents per pound was a reasonable rate which the petitioners might have paid to a custom harvester.The petitioners contend that the services provided by Mrs. Cannon were similar to those provided by a custom harvester and that therefore the rate at which she was paid was reasonable. However, on this record, we find little resemblance between Mrs. Cannon's services and those of a custom harvester. We have set forth in our findings of fact the responsibilities and services of a custom harvester. The facts show that a custom *67 harvester provides essentially all the equipment, material, and labor needed to conduct the harvest; he is an entrepreneur, who can profit when the harvest is abundant and who risks losses when it is poor. On the other hand, we have found that Mrs. Cannon provided essentially only her personal services; she hired and supervised laborers and operated and maintained the picking machines. In support of their position, the petitioners contend that Mrs. Cannon supplied the two picking machines which Mr. Stonebrook received from S & E. They argue that Mr. Stonebrook made a completed gift of the machines prior to the harvest and that Mrs. Cannon was, therefore, their sole owner when she used them.In response, the Commissioner argues that Mr. Stonebrook could not have transferred ownership to Mrs. Canno prior to the harvest since, although he received possession of the machines in May 1974, he did not receive title until the bill of sale was executed on July 17, 1974. In the alternative, he argues that Mr. Stonebrook's gift was not complete until after the harvest. The essential elements of an inter vivos gift include: (3) a clear and unmistakable intention on the part of the donor *68 to absolutely and irrevocably divest himself of the title, dominion, and control of the subject matter of the gift, inpraesenti; (4) the irrevocable transer of the present legal title and of the dominion and control of the entire gift to the donee, so that the donor can exercise no further act of dominion or control over it; * * * [Weil v. Commissioner,31 B.T.A. 899, 906 (1934), affd. 82 F. 2d 561 (5th Cir. 1936), cert. denied 299 U.S. 552 (1936).] See Shelden v. Commissioner,25 B.T.A. 5 (1931). At trial, Mr. Stonebrook and Mrs. Cannon testified that the gift was completed prior to the harvest. Yet, there was no writing evidencing the gift, and we are not bound to accept uncorroborated, self-serving testimony. See Armes v. Commissioner,448 F. 2d 972 (5th Cir. 1971), affg. on this issue a Memorandum Opinion of this Court. Here, there is no evidence that at the time of the purported gift, Mrs. Cannon in any way took control of the machines. In fact, Mr. Stonebrook testified that the machines were "Left * * * where they were on all previous years." Mr. Stonebrook also testified that Mrs. *69 Cannon could have disposed of the machines had she desired, but we cannot believe that testimony. At the time of the purported gift, the petitioners were faced with the harvest of a bumper crop, and those machines were essential to that harvest. If Mrs. Cannon had sold those machines at that time, the petitioners would have had to secure replacements, and a custom harvester, who testified for the petitioners, stated that to secure replacements in 1974 would have taken 6 months because of a tight market. Even if the petitioners had been able to find appropriate machines, the expense would have been considerable. Without better proof, we are unable to believe that Mr. Stonebrook relinquished all control over his machines prior to the harvest. Accordingly, we have found as a fact that Mr. Stonebrook's gift was conditioned on the machines being used in the harvest, and we conclude that the gift was not to take effect until the harvest was completed. Because of our conclusion, we need not consider the Commissioner's argument that Mr. Stonebrook did not receive title to the machines until July 17, 1974. The petitioners also argue that although Mrs. Cannon did not furnish the materials *70 needed to operate the picking machines, such as spare parts or gas and oil, it was not unusual for a farmer to provide a custom harvester with such materials. However, this contention is inconsistent with both the stipulation and testimony. Paragraph 12 of the stipulation reads, in part: "In general, the harvestor provides all of the oil, gas, and maintenance required by the [picking] machines." (Emphasis added.) In addition, the custom harvester who testified for the petitioners stated that sometimes farmers loaned harvesters spare parts or other materials when needed quickly; he gave no indication that farmers routinely make gifts of such supplies to the harvesters. Here, there is no evidence that Mrs. Cannon ever returned the gas and oil she used, or that the picking machines, tractors, and tools were provided to her on an emergency basis to cover breakdowns or unforeseen circumstances. Rahter, it is clear that the petitioners furnished all or substantially all of the equipment and materials needed for the harvest. Essentially, Mrs. Cannon furnished only her personal services. She received a gross amount of $107,850.00, resulting in earnings of $72,586.00 after expenses *71 for her 3 months' work. By allowing a deduction of $52,891,35, the Commissioner has determined in effect that reasonable compensation for Mrs. Cannon's services was such amount less her expenses, or $17,627.35. The petitioners have presented no evidence to show that reasonable compensation for Mrs. Canon's services was greater than the $17,627.35 allowed by the Commissioner. They did testify that Mrs. Cannon completed the harvest with no crop loss, but they failed to show that others could not have obtained equally good results or that crop losses were the norm. Compare Home Interiors & Gifts, Inc. v. Commissioner,73 T.C. 1142 (1980). It is also true that, in form at least, Mrs. Cannon was compensated on a contingent basis. See Home Interiors & Gifts, Inc. v. Commissioner,supra.However, her contract was entered into in the spring of 1974, only 1 or 2 months before the harvest began, and we find nothing in the record to indicate that Mr. Stonebrook and Mr. Ediger, who were experienced farmers, did not have a reasonable estimate of the size of their crop at that time. In fact, Mr. Stonebrook testified that well before the harvest he knew *72 that there would be a "big crop." In this case, the petitioners put the entire emphasis of their case on attempting to show that Mrs. Cannon was a custom harvester. It is clear she was not, and there is no proof in the record that an individual hired to direct a blackberry harvest for 3 months, but not to provide equipment, materials, or capital, could reasonably expect to earn more than $17,627.35. Accordingly, we sustain the Commissioner's determination. Decision will be entered for the respondent. Footnotes
1. Why she was not paid the contract rate of 7 cents per pound is unexplained.↩