T.C. Memo. 1997-338


UNITED STATES TAX COURT


SUNBELT CLOTHING COMPANY, INC., f.k.a. UNPRINTED T-SHIRT
WAREHOUSE, INC., Petitioner <u>v</u>. COMMISSIONER OF INTERNAL REVENUE,
Respondent


Docket No. 704-95.                          Filed July 28, 1997.


<u>Stanley L. Blend</u> and <u>Elizabeth A. Dawson</u>, for petitioner.

<u>Melanie R. Urban</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION


RUWE, <u>Judge</u>:  Respondent determined deficiencies in
petitioner's Federal income taxes and an addition to tax as
follows:

|  | | Accuracy-related Penalty |
| FYE | Deficiency | Sec. 6662(a)[1] |
| 7/29/90 | $677,203 | $135,441 |
| 7/28/91 | 650,359 | 130,072 |
| 8/02/92 | 499,789 | 99,958 |

[1]Respondent has conceded the accuracy-related penalty under sec. 6662(a) for the years in issue.

After concessions, the sole issue for decision is whether the amount of compensation paid by petitioner to its officers, Daniel Bennett and Burton Sokol, was reasonable and thus deductible as a business expense under section 162(a).[1]

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and second stipulation of facts are incorporated herein by this reference.

Petitioner is a catalog wholesaler of fashionable women's sportswear. Its principal place of business was in San Antonio, Texas, at the time the petition was filed in this case. Petitioner was incorporated on June 12, 1978, under the name Unprinted T-Shirt Warehouse, Inc. Its name was changed to Sunbelt Clothing Co. on January 25, 1991.

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the taxable years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

Petitioner's original shareholders and their respective shareholdings were:

| Shareholder | Shareholdings |
| --- | --- |
| Daniel A. Bennett | 45 shares |
| William P. Wylie | 15 shares |
| John T. Wylie | 15 shares |
| William W. Robbins | 10 shares |
| James B. Morris | 15 shares |

Petitioner's original plan to issue 10 shares of stock to William W. Robbins and 15 shares of stock to James B. Morris was canceled due to their desire to cease active participation in petitioner. During petitioner's first year of operations, Mr. Bennett hired Mr. Sokol as an employee to help him with the business. On June 29, 1979, Mr. Sokol became a shareholder in petitioner by purchasing 15 shares of stock from Mr. Bennett and obtaining 15 treasury shares from petitioner. As a result of these transactions, Mr. Sokol and Mr. Bennett each became a one-third shareholder of petitioner. The final one-third was held by John T. Wylie and his son, William. With the exception of Mr. Wylie and his son, none of petitioner's shareholders were related to one another through blood or marriage. On December 31, 1982, the stock of William P. Wylie and John T. Wylie was redeemed by petitioner. After that redemption, Messrs. Bennett and Sokol became equal shareholders in petitioner.

Prior to petitioner's incorporation, Mr. Bennett owned a printed T-shirt business, which he started in 1973 or 1974. Mr. Bennett chose to distinguish petitioner from other industry participants by creating "Sunbelt"-branded product lines and distributing them through a company-designed catalog that was mailed directly to existing and potential customers. The catalog was an efficient and economical way for petitioner to offer its clothing lines to a large number of customers without incurring the expenses associated with direct salespeople. Petitioner's initial catalog consisted of only two pages and was sent to customers found through trade journal advertisements or in the yellow pages. Petitioner's catalog expanded from 20 pages in 1982 to approximately 100 pages by 1989. During fiscal years ending July 29, 1990, July 28, 1991, and August 2, 1992, petitioner produced eight catalogs per year, which included four full-scale seasonal catalogs and at least four sale and special mailing catalogs. Petitioner mailed over 250,000 copies of each catalog to various wholesalers and retail customers. From these mailings, petitioner generated over 100,000 customers. Petitioner's customers have traditionally been small retail clothing and general merchandise stores. Orders for merchandise were processed using inhouse trained telephone personnel operating through phone banks at petitioner's offices.

Petitioner worked with a large number of outside contractors to provide all its products. For any given garment, petitioner would typically work closely with other companies to design the garment and with manufacturers to develop and approve product samples, coordinate raw materials production, and insure that quality products were delivered on a timely basis. Bid proposals and product samples were solicited from several manufacturers, and petitioner would contract for specific production amounts with one or more manufacturers. During each of the fiscal years 1990 through 1992, petitioner purchased clothing products from 25 to 50 different manufacturers.

Prior to petitioner's 1992 fiscal year, completed products were delivered to petitioner at one of six warehouses in San Antonio, Texas. Sometime in fiscal year 1991, Mr. Bennett hired the architects and the builder and found the land to build a new 150,000-square foot distribution center to improve petitioner's inventory management and customer service capabilities. Mr. Bennett also contracted for a computerized state-of-the-art inventory tracking system to provide for more efficient order picking, packing, and billing operations. Mr. Bennett also implemented additional technological advancements, such as wire-guided forklifts for the new distribution center.

As petitioner's president, Mr. Bennett was in charge of day-to-day operations. During petitioner's formative years, Mr.

Bennett took primary responsibility for originating the concepts for products; choosing the colors for T-shirts and clothing to be manufactured and marketed; determining the forecast of customer orders based on previous years' sales activity; determining the quantity, sizes, and colors to order for the upcoming seasons of each product; hiring and training personnel; developing a marketing plan; developing petitioner's customer base; advertising and promotion; and developing a plan to fill customer orders.

Mr. Bennett was a hands-on manager, involved in every aspect of petitioner's operations. He was responsible for the development of petitioner's catalog, which included the hiring of the photographers and models that were used to produce the catalogs. He also approved the clothing, sketches, and colors for the photography sessions. In addition, Mr. Bennett attended and directed the sessions, which required traveling to the various locations. Mr. Bennett also worked with the catalog design personnel to review the approximately 7,200 slides taken for each catalog in order to decide on the layout of the catalog. Furthermore, Mr. Bennett determined how much space in a catalog to allocate to each product, the layout of pictures in the catalog, and which product photographs to pair with others. During the years at issue, sketches for photograph sessions were always approved by Mr. Bennett before the session took place. He

also selected and approved each and every product to be included in the catalog.  Mr. Bennett was also constantly researching products and fashion forecasts for national and international markets.  He also personally designed many of petitioner's products over the years.  Mr. Bennett typically worked 60 or more hours per week, 7 days a week.

Mr. Bennett hired Mr. Sokol as an employee because of Mr. Sokol's qualifications in the textile industry.  Mr. Sokol held a bachelor of science degree in textile engineering.  Prior to coming to work for petitioner, Mr. Sokol worked in Mexico for 25 to 30 years, first as the general manager of a knitting firm and then as owner of a textile machinery sales firm.  Mr. Sokol's duties during petitioner's formative years were to locate manufacturers to make the products according to Mr. Bennett's specifications, visit and inspect the factories to ensure they had adequate machinery and personnel to fill the volume of orders that petitioner would be demanding, and assure that the products of the manufacturers met petitioner's quality control specifications.  In addition, Mr. Sokol oversaw the operations at petitioner's warehouse and maintained its facilities.

During the years in issue, Mr. Sokol was dealing with 50 or more manufacturers.  Mr. Sokol visited the manufacturing facilities throughout the United States and abroad, so that quality control and on-time supply could be assured.  In

addition, Mr. Sokol oversaw petitioner's inventory operations at six separate warehouse locations. Mr. Sokol worked full time for petitioner, as well as many weekends and late nights.

On August 9, 1991, petitioner redeemed all of Mr. Sokol's stock, leaving Mr. Bennett as the sole shareholder. There was no connection between the redemption of Mr. Sokol's stock and the compensation previously paid to Mr. Bennett and Mr. Sokol during the years in issue. The purpose of the redemption was to allow Mr. Sokol to retire. Nevertheless, after the redemption, he remained as a part-time employee of petitioner working significantly reduced hours, taking more vacations, and receiving less pay, all at his own initiative. Mr. Sokol worked for petitioner until his death on November 26, 1993.

In 1988, petitioner entered into a continuing guaranty with Texas Commerce Bank-San Antonio for $3 million. Mr. Bennett personally guaranteed petitioner's obligation. In 1989, Mr. Sokol agreed to guarantee personally petitioner's line-of-credit. In 1990, petitioner's credit line was amended and increased to $6.5 million. In 1991, the line-of-credit was increased again to $11.5 million, and Mr. Sokol was removed as a guarantor.

Petitioner prospered under the leadership of Messrs. Bennett and Sokol. The following chart reflects the yearly increases in

petitioner's gross sales, net income, shareholder equity, and return on equity based on beginning of year equity:[2]

| FYE | Gross Sales | Net Income | Shareholder Equity | Return on Equity (Based on beg. year) |
|---|---|---|---|---|
| 5/31/1980 | $547,842 | $33,513 | $39,940 | N/A |
| 5/31/1981 | 1,156,145 | 59,700 | 108,128 | 149.37 percent |
| 5/31/1982 | 1,586,016 | 63,438 | 174,566 | 58.67 percent |
| 5/31/1983 | 2,504,203 | 50,533 | 225,099 | 28.95 percent |
| 5/31/1984 | 3,622,449 | 76,662 | 294,761 | 34.06 percent |
| 5/31/1985 | 6,175,083 | 91,764 | 385,783 | 31.13 percent |
| 5/31/1986 | 7,833,297 | 124,685 | 510,468 | 32.32 percent |
| 7/31/1986[1] | 1,473,885 | 48,749 | 559,217 | 9.55 percent |
| 7/31/1987 | 10,538,339 | 401,344 | 960,561 | 71.77 percent |
| 7/31/1988 | 20,030,341 | 1,511,694 | 2,452,255 | 157.38 percent |
| 7/30/1989[2] | 39,802,165 | 3,273,771 | 5,702,026 | 133.50 percent |
| 7/29/1990 | 54,455,167 | 4,662,632 | 10,316,658 | 81.77 percent |
| 7/28/1991 | 69,748,749 | 6,754,903 | 17,023,561 | 65.48 percent |
| 8/02/1992 | 70,059,961 | 5,550,348 | 13,949,909 | [3]65.95 percent |

[1]In fiscal year 1986, petitioner changed its fiscal year end to July 31, which resulted in a short fiscal year from June 1, 1986, to July 31, 1986.

[2]In fiscal year 1989, petitioner's taxable year was changed to a 52/53 week fiscal year ending on the closest Sunday to July 31.

[3]Adjusted for the buyout of Mr. Sokol's stock, which occurred on Aug. 9, 1991.

On August 31, 1986, petitioner's board of directors (Mr. Bennett and Mr. Sokol) met to summarize and consolidate, into one writing, the formal and informal meetings of the board of directors concerning the dividend policy of petitioner. Petitioner's board of directors resolved that, prior to payment of substantial dividends, the following would need to be accomplished: (1) The compensation due key personnel of petitioner would need to be paid; (2) adequate reserves to fund

[2]The parties have stipulated the accuracy of these figures.

existing operations would need to be maintained; (3) adequate reserves to accommodate planned sales expansion and product-line expansion (forecasted to be substantial for the 5 years following the August 31, 1986, meeting) would need to be maintained; (4) reserves to facilitate the anticipated construction of a major warehouse facility would need to be set aside; and (5) adequate reserves to facilitate expansion of petitioner's operations overseas would need to be established.

The dividends paid by petitioner during the fiscal years at issue were:

| FYE | Shares Outstanding | Dividends Paid | Dividends Per Share |
|-----|--------------------|----------------|---------------------|
| 7/29/90 | 60 | $48,000 | $800 |
| 7/28/91 | 60 | 48,000 | 800 |
| 8/02/92 | 30 | 24,000 | 800 |

Mr. Bennett, petitioner's president, and Mr. Sokol, petitioner's treasurer (and later vice president), were authorized to receive salaries for their day-to-day work as petitioner's employees. Nevertheless, in order to maintain adequate cash flow at the beginning of petitioner's operations, Mr. Bennett waived any salary payments through January 1, 1980. As reflected in the minutes of petitioner's annual meeting of directors on June 29, 1979, Mr. Bennett further agreed to accept only $1,000 as monthly compensation after January 1, 1980, in return for a resolution on behalf of petitioner to "more

adequately compensate Mr. Bennett and to reimburse Mr. Bennett by adequately improving his salary at such future date as the corporation is in a position to do so."  Mr. Sokol also agreed to work for an amount less than his normal wage rate in return for petitioner's promise to provide additional future compensation at such time as petitioner's cash flow permitted.

From incorporation through fiscal year 1989, petitioner paid Messrs. Bennett and Sokol the following salaries:

| FYE | Mr. Bennett | Mr. Sokol |
|---|---|---|
| 6/1/78-5/31/79 | -0- | N/A |
| 6/1/79-5/31/80 | -0- | $17,000 |
| 6/1/80-5/31/81 | $20,000 | 35,000 |
| 6/1/81-5/31/82 | 29,000 | 31,000 |
| 6/1/82-5/31/83 | 30,000 | 36,000 |
| 6/1/83-5/31/84 | 43,500 | 49,500 |
| 6/1/84-5/31/85 | 76,000 | 76,000 |
| 6/1/85-5/31/86 | 94,000 | 94,000 |
| 6/1/86-7/31/86 | 15,000 | 15,000 |
| 8/1/86-7/31/87 | 106,000 | 106,000 |
| 8/1/87-7/31/88 | 157,855 | 128,047 |
| 8/1/88-7/30/89 | 1,552,783 | 305,668 |

During the years in issue, compensation for Messrs. Bennett and Sokol was determined on an annual basis by mutual agreement. Even though Messrs. Bennett and Sokol were equal shareholders during fiscal years 1990 and 1991, their compensation was unequal because their contributions and responsibilities were not the same.  In fiscal year 1992, Mr. Sokol's compensation was reduced significantly reflecting the reduction in his responsibilities and time commitment.

During fiscal years 1990 through 1992, Messrs. Bennett and Sokol were paid the following salaries:

| FYE | Mr. Bennett | Mr. Sokol |
|-----|-------------|-----------|
| 7/29/90 | $2,030,000 | $670,000 |
| 7/28/91 | 2,030,000 | 670,000 |
| 8/02/92 | 2,050,192 | 173,077 |

Petitioner deducted these amounts.

In the notice of deficiency, respondent disallowed petitioner's deductions for salaries paid to Messrs. Bennett and Sokol that were in excess of the following amounts:

| FYE | Mr. Bennett | Mr. Sokol |
|-----|-------------|-----------|
| 7/29/90 | $485,027 | $230,202 |
| 7/28/91 | 541,273 | 252,634 |
| 8/02/92 | 585,391 | [1]N/A |

[1]Compensation paid to Mr. Sokol for the 1992 fiscal year is not in dispute.

OPINION

The sole issue for decision is whether the amounts petitioner paid to Messrs. Bennett and Sokol from fiscal years 1989 through 1992 constituted reasonable compensation for services rendered within the meaning of section 162(a)(1).[3]

---

[3]Sec. 162(a)(1) allows as a deduction a reasonable allowance for compensation for personal services actually rendered. Respondent concedes that the amount of any compensation found to
                                                      (continued...)

Whether the compensation is reasonable is a question to be resolved on the basis of an examination of all the facts and circumstances of the case.  Home Interiors & Gifts, Inc. v. Commissioner, 73 T.C. 1142, 1155 (1980).  Respondent's determination is presumed correct, and petitioner bears the burden of proving the reasonableness of the compensation.  Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).

In addressing the reasonableness of compensation, courts have considered a number of factors including:  (1) The employee's qualifications; (2) the nature, extent, and scope of the employee's work; (3) the size and complexities of the employer's business; (4) a comparison of salaries paid with the employer's gross and net income; (5) the prevailing general economic conditions; (6) a comparison of salaries paid with distributions and retained earnings; (7) the prevailing rates of compensation for comparable positions in comparable concerns; (8) the amount of compensation paid to the particular employee in previous years; and (9) the salary policy of the employer as to all employees.  Rutter v. Commissioner, 853 F.2d 1267, 1274 (5th Cir. 1988), affg. T.C. Memo. 1986-407; Owensby & Kritikos, Inc. v. Commissioner, 819 F.2d 1315, 1323 (5th Cir. 1987), affg. T.C. Memo. 1985-267; Home Interiors & Gifts, Inc. v. Commissioner,

---

[3](...continued)
be reasonable was paid for services rendered.

supra at 1155-1156.  No single factor is determinative; rather, we must consider and weigh the totality of facts and circumstances in arriving at our decision.  Rutter v. Commissioner, supra at 1271; Owensby & Kritikos, Inc. v. Commissioner, supra at 1323.

1.  Employee's Qualifications

An employee's superior qualifications for his or her position with the business may justify high compensation.  See, e.g., Home Interiors & Gifts, Inc. v. Commissioner, supra at 1158; Dave Fischbein Manufacturing Co. v. Commissioner, 59 T.C. 338, 352-353 (1972).

By virtue of their training, experience, creativity, and dedication, both Messrs. Bennett and Sokol were exceptionally qualified for petitioner's business.  Together, they understood and controlled every aspect of petitioner's operations.  Mr. Bennett was the creative force behind petitioner's catalog, its sole marketing tool.  Complementing Mr. Bennett's creativity was the experience of Mr. Sokol, a textile engineer who had worked in the textile industry for over 30 years.

Petitioner's profitability rested upon its sales.  The primary reasons for petitioner's sales, growth, and success were Messrs. Bennett's and Sokol's ambition, creativity, vision, and

energy.  See <u>Home Interiors & Gifts, Inc. v. Commissioner</u>, <u>supra</u> at 1158; <u>Dave Fischbein Manufacturing Co. v. Commissioner</u>, <u>supra</u>.

2.  <u>Nature, Extent, and Scope of the Employee's Work</u>

An employee's position, hours worked, duties performed, and general importance to the success of a business may justify high compensation.  <u>Home Interiors & Gifts, Inc. v. Commissioner</u>, <u>supra</u> at 1158.  In this case, the history of Messrs. Bennett's and Sokol's contributions to petitioner must be considered, rather than just their contributions during the years in issue, because the compensation petitioner paid to them during the years in issue represents, in part, an attempt to rectify prior undercompensation.

Mr. Bennett was petitioner's key employee and the main reason for its success.  As president, he was the driving force behind petitioner's business from its inception.  Mr. Bennett was responsible for the designing and selection of the clothes petitioner sold.  He was also responsible for the design and creation of petitioner's catalog--its sole method of advertising.  Mr. Bennett ensured that the catalog was photographed, assembled, printed, and mailed to his specifications.  He also oversaw in-house store order operations, forecasting demand, developing a customer base, overseeing facilities construction, and working with banks to ensure financial stability for petitioner.

Mr. Sokol's responsibilities were more limited than Mr. Bennett's, but his compensation was also considerably less. Mr. Sokol, nevertheless, performed a wide variety of activities which contributed to the success of a very successful company. As petitioner's vice president and treasurer, Mr. Sokol was responsible for petitioner's bank relations, purchasing, inventory, as well as sourcing the products (i.e., finding and hiring the manufacturers, then verifying the quality). As part of his sourcing responsibilities, Mr. Sokol inspected the operations of 25 to 50 different manufacturers in order to determine their manufacturing capabilities.

Messrs. Bennett and Sokol worked long hours for petitioner. Both worked weekends and week nights in addition to the 40-hour workweek. They often worked together afterhours at Mr. Sokol's home. They performed all petitioner's executive and managerial functions and performed or oversaw virtually all its day-to-day activities. Petitioner's growth and prosperity were due directly to their skills, dedication, and creativity.

Courts have also considered whether an employee personally guaranteed his or her employer's debt in determining whether the employee's compensation is reasonable. In certain situations, an employee's personal guaranty of his or her employer's debt may entitle the employer to pay a greater salary to the employee than the employer would otherwise have paid. See <u>Owensby & Kritikos,</u>

Inc. v. Commissioner, 819 F.2d at 1325 n.33; R.J. Nicoll Co. v. Commissioner, 59 T.C. 37, 51 (1972); see also Acme Constr. Co. v. Commissioner, T.C. Memo. 1995-6; BOCA Constr., Inc. v. Commissioner, T.C. Memo. 1995-5.  Here, both Messrs. Bennett and Sokol personally guaranteed the repayment of petitioner's multi-million dollar revolving line-of-credit.

3.  Size and Complexities of the Employer's Business

     Courts have considered the size and complexity of a taxpayer's business in deciding whether compensation is reasonable.  Pepsi-Cola Bottling Co. v. Commissioner, 528 F.2d 176, 179 (10th Cir. 1975), affg. 61 T.C. 564 (1974).

     Petitioner's gross sales--an indicator of its size--were $54,455,167, $69,748,749, and $70,059,961, respectively, for fiscal years 1990, 1991, and 1992.  By 1990, petitioner's operations involved rental space in six separate warehouses and eventually required the construction of a 150,000-square foot distributing center with a computerized inventory tracking system to handle the sales volume.  In addition, petitioner employed approximately 200 people during the years in issue.

4.  Comparison of Salaries Paid to Net and Gross Income

     Courts have compared sales, net income, and capital value to amounts of compensation in deciding whether compensation is

reasonable.  Owensby & Kritikos, Inc. v. Commissioner, supra at

1325-1326; Home Interiors & Gifts, Inc. v. Commissioner, 73 T.C.

at 1155-1156.

During the fiscal years 1980 through 1988, petitioner paid

Messrs. Bennett and Sokol less compensation than they were

entitled to.  Petitioner increased its yearly gross sales from

$547,842 in fiscal year 1980 to $39,802,165 by fiscal year 1989.

For the years in issue, Messrs. Bennett's and Sokol's salaries as

a percentage of gross sales, gross profit, net income (before

deducting their compensation and after paying taxes), and taxable

net income (before deducting their compensation) were:

| FYE | Gross Sales | Gross Profit | Net Income | Taxable Income |
|---|---|---|---|---|
| 7/29/90 | 4.96 percent | 16.00 percent | 36.67 percent | 26.78 percent |
| 7/28/91 | 3.87 percent | 13.83 percent | 28.56 percent | 20.78 percent |
| 8/02/92 | 2.93 percent | 10.79 percent | 26.97 percent | 18.35 percent |
| Averages | 3.92 percent | 13.54 percent | 30.73 percent | 21.97 percent |

We find that these percentages are reasonable in light of

the qualifications of Messrs. Bennett and Sokol, the nature,

extent, and scope of their work, and the years of prior

undercompensation.  See, e.g., Pulsar Components Intnl., Inc. v.

Commissioner, T.C. Memo. 1996-129; Acme Constr. Co. v.

Commissioner, supra; BOCA Constr., Inc. v. Commissioner, supra;

Universal Manufacturing Co. v. Commissioner, T.C. Memo. 1994-367;

L & B Pipe & Supply Co. v. Commissioner, T.C. Memo. 1994-187;

Automotive Inv. Dev., Inc. v. Commissioner, T.C. Memo. 1993-298;

Paramount Clothing Co. v. Commissioner, T.C. Memo. 1979-64.

5.  General Economic Conditions

This factor helps to determine whether the success of a business is attributable to general economic conditions, as opposed to the efforts and business acumen of the employees. General economic conditions may affect a business' performance and indicate the extent, if any, of the employees' effect on the company. Adverse economic conditions, for example, tend to show that an employee's skill was important to a company that grew during hard times.

Respondent contends that the dramatic increase in gross sales was not caused solely by the efforts of Messrs. Bennett and Sokol, but rather, that the general economic conditions of the times had a great impact on petitioner's business just prior to and during the years in issue. Respondent argues that the increase in sales was, for the most part, a fortuitous circumstance.

Petitioner's gross sales rose from $54,455,167 in fiscal year 1990 to $69,748,749 in fiscal year 1991 to $70,059,961 in fiscal year 1992, an overall increase of 29 percent. If the economic conditions were indeed favorable during this period, we

would expect to see a corresponding increase in sales for the industry in general.  However, the evidence shows that the industry remained relatively stagnant over this period. Respondent's own expert lists the sales figures of 11 companies in the clothing industry during 1990, 1991, and 1992.[4]  The combined sales for these companies dropped from $1,059,214,617 in 1990 to $997,443,690 in 1991 and rebounded to $1,078,385,309 in 1992.  This translates to an overall increase of only 2 percent during this period.  Consequently, we find that the increase in petitioner's sales, while partly due to fortuitous market circumstances, was due primarily to the insight and hard work of Messrs. Bennett and Sokol.

6.  Comparison of Salaries Paid With Distributions to Messrs.
    Bennett and Sokol and Retained Earnings

The failure to pay more than minimal dividends may suggest that reported compensation actually is (in whole or in part) a dividend.  Owensby & Kritikos, Inc. v. Commissioner, 819 F.2d at 1323-1324; Charles Schneider & Co. v. Commissioner, 500 F.2d 148, 151-152 (8th Cir. 1974), affg. T.C. Memo. 1973-130. Corporations, however, are not required to pay dividends. Indeed, shareholders may be equally content with the appreciation

---

[4]Respondent's expert, Francis X. Burns of the IPC Group, LLC, prepared a report on the compensation of Messrs. Bennett and Sokol.  This report is discussed infra.

of their stock caused, for example, by the retention of earnings. Owensby & Kritikos, Inc. v. Commissioner, supra; Home Interiors & Gifts, Inc. v. Commissioner, 73 T.C. at 1162.

Petitioner paid $48,000 in dividends in fiscal years 1990 and 1991 and $24,000 in dividends in fiscal year 1992. Whether to pay a dividend, and the amount thereof, were business decisions made by petitioner's board of directors. As explained in the August 31, 1986, minutes of petitioner's board of directors meeting, the decision whether to pay dividends was based on petitioner's need to: (1) Make up past undercompensation of its officers, (2) assure current growth, (3) assure future growth, (4) allow for expansion into a new 150,000-square foot distribution center, and (5) prepare for anticipated overseas expansion. We decline to second-guess the board of director's business judgment under the facts of this case; we view its decisions concerning the payment of dividends and the amounts thereof as reasonable business decisions.

In reviewing the reasonableness of an employee's compensation, courts often look at whether a hypothetical shareholder would have received a fair return on his investment after the payment of the compensation in question. Owensby & Kritikos, Inc. v. Commissioner, supra at 1326-1327.

A hypothetical investor in petitioner would have realized the following returns on equity for the years in issue: 81.77

percent for 1990; 65.48 percent for 1991; and 65.95 percent for 1992.

In addition to the fact that the increase in petitioner's retained earnings most likely increased the value of its stock, we believe that a hypothetical investor would have considered petitioner's performance for this period impressive.[5]

7. Prevailing Rates of Compensation for Comparable Positions in Comparable Companies

Both petitioner and respondent rely on expert testimony with respect to this factor. We weigh an expert's testimony in light of his or her qualifications and considering all credible evidence in the record. Depending on what we believe is appropriate under the facts and circumstances of the case, we may either reject or accept an expert's opinion in its entirety, or accept selective portions of it. Helvering v. National Grocery Co., 304 U.S. 282, 294-295 (1938); Seagate Technology, Inc. v.

[5]These return-on-equity (ROE) figures are calculated by dividing net income by the shareholder equity at the beginning of the year. Respondent argues that the petitioner's ROE should be calculated using the average of the beginning and ending shareholder equity, rather than beginning equity as petitioner suggests. Respondent contends that under the average equity method, petitioner's ROE during the years in issue was actually: 58.21 percent for 1990, 49.41 percent for 1991, and 34.80 percent for 1992. While respondent's ROE is lower, we still find the figures impressive. Thus, even if we were to adopt the average equity method in calculating petitioner's ROE, the results obtained would not change our conclusion.

Commissioner, 102 T.C. 149, 186 (1994); Parker v. Commissioner, 86 T.C. 547, 562 (1986).

Respondent presented the reports and testimony of Francis X. Burns of the IPC Group, LLC. (IPC).  Mr. Burns and IPC specialize in valuing intellectual property and intangible assets and in transfer pricing issues.

Mr. Burns chose 11 "peer group" companies and then compared the net sales, average gross margin, and number of employees of those 11 "peer group" companies to petitioner.  After determining that Mr. Bennett's position most resembled a chief executive officer (CEO) and that Mr. Sokol's position most resembled a chief operating officer (COO), Mr. Burns then compared the CEO's and COO's of his "peer group" to Messrs. Bennett and Sokol.  The criteria Mr. Burns used to compare Messrs. Bennett and Sokol to his "peer group" were limited, however, to age, number of years of industry experience, and various positions held by the executives.  At trial, Mr. Burns testified that he did not specifically consider whether Messrs. Bennett or Sokol had duties more expansive than the traditional CEO and COO, nor did he consider the relative values of each executive to petitioner. Mr. Burns concluded that a reasonable compensation for Mr. Bennett would be the average of the interquartile range[6] of the

---

[6]The interquartile range is the range of values encompassing the middle 50 percent of a sample group.

"peer group" CEO's, or $482,807, $532,621, and $622,714 for fiscal years 1990, 1991, and 1992, respectively. Using similar techniques, Mr. Burns provided estimates of Mr. Sokol's reasonable compensation for fiscal years 1990 and 1991 of $354,163 and $382,330, respectively.

Relying on Mr. Burns' report, respondent essentially argues that Messrs. Bennett and Sokol are entitled to no more than the industry average. We do not find this argument persuasive. The regulations promulgated under section 162(a)(1) direct a comparison of salaries paid by similar businesses to similar employees under similar circumstances. Sec. 1.162-7(b)(3), Income Tax Regs. However, section 162 is "not designed to regulate businesses by denying them a deduction for the payment of compensation in excess of the norm" in cases where other factors call for higher compensation. Home Interiors & Gifts, Inc. v. Commissioner, 73 T.C. at 1162.

Respondent also introduced the report and testimony of Sigmund Wesolowski. Mr. Wesolowski was the former president of Pandora, Inc. (Pandora), a manufacturer, seller, and distributor of sportswear. Respondent argues that Pandora and petitioner were similar companies and that Mr. Wesolowski and Mr. Bennett

held similar positions.  Respondent contends that Mr. Wesolowski and Mr. Bennett should therefore receive similar compensation.[7]

We do not agree, however, that either the companies or the positions were that similar.  Pandora did 65 percent of its own manufacturing, while petitioner contracted with outside manufacturers to provide all its products.  In addition, Mr. Bennett performed many of the duties and was responsible for many of the tasks that Mr. Wesolowski shared with or delegated to other employees and managers.  Finally, we cannot ignore the fact that Pandora went out of business in 1990, shortly after Mr. Wesolowski left the company.  Consequently, we do not find the comparisons of petitioner and Mr. Bennett to Pandora and Mr. Wesolowski compelling.

Petitioner's expert, Joseph P. Gallagher of the Hay Group, an international management consulting firm, valued Messrs. Bennett's and Sokol's services under the "Hay Guide Chart-Profile Method of Job Evaluation".  This methodology requires assigning points to each executive for know-how, problem solving, and accountability associated with the job requirements and talents of that executive and then comparing those points to a data base

[7]In his expert report, Mr. Wesolowski states that his base salary was $150,000 and that he also received yearend contractual incentives based on the performance of the company in addition to stock options (which he did not exercise).  Although he provides a hypothetical salary based on this plan, Mr. Wesolowski does not state the exact compensation he received in any year.

consisting of several hundred annually surveyed companies in order to assign a base compensation value for each officer.

Mr. Gallagher also considered the performance of petitioner by examining its financial data. From this data, Mr. Gallagher concluded that petitioner has attained an exceptional level of accomplishment which strongly suggests that the key executives, Messrs. Bennett and Sokol, should be richly rewarded for their financial stewardship. Consequently, Mr. Gallagher concluded that pay levels for Messrs. Bennett and Sokol should be "well in excess of the market median".

After calculating an appropriate amount of direct compensation, Mr. Gallagher determined that a reasonable compensation package for Messrs. Bennett and Sokol would also include an amount necessary to fund a pension plan to provide a competitive retirement income, as well as profit sharing to recognize petitioner's exceptional performance. Mr. Gallagher's conclusions are expressed as follows:

Appropriate Compensation for Mr. Bennett

| FYE | Direct Compensation | Pension Plan | Profit Sharing | Total Compensation | Actually Paid | Difference |
|---|---|---|---|---|---|---|
| 7/29/90 | $1,146,800 | $126,100 | $899,900 | $2,172,800 | $2,030,000 | $(142,800) |
| 7/28/91 | 810,000 | 132,400 | 1,292,800 | 2,235,200 | 2,030,000 | (205,200) |
| 8/02/92 | 1,140,300 | 139,000 | 729,700 | 2,009,000 | 2,050,200 | 41,200 |
| Total | $3,097,100 | $397,500 | $2,922,400 | $6,417,000 | $6,110,200 | $(306,800) |

Appropriate Compensation for Mr. Sokol

| FYE | Direct Compensation | Pension Plan | Profit Sharing | Total Compensation | Actually Paid | Difference |
|---|---|---|---|---|---|---|
| 7/29/90 | $513,400 | $327,000 | $300,000 | $1,140,400 | $670,000 | $(470,400) |
| 7/28/91 | 511,400 | 343,300 | 430,900 | 1,285,600 | 670,000 | (615,600) |
| Total | $1,024,800 | $670,300 | $730,900 | $2,426,000 | $1,340,000 | ($1,086,000) |

Although we do not rely solely on Mr. Gallagher's conclusions in this regard, we do find his qualifications in the area of executive compensation superior to those of Mr. Burns. In addition, Mr. Gallagher contemplated many of the same factors considered by this and other courts in developing his compensation plan for Messrs. Bennett and Sokol. Therefore, we find his conclusions regarding the reasonable compensation of Messrs. Bennett and Sokol persuasive.

8. Compensation Paid in Prior Years

An employer may deduct compensation paid to an employee in a year although the employee performed the services in a prior year. Lucas v. Ox Fibre Brush Co., 281 U.S. 115, 119 (1930); see also R.J. Nicoll Co. v. Commissioner, 59 T.C. at 50, and the cases cited

therein.  We find that Messrs. Bennett and Sokol were undercompensated in the years prior to those in issue.

Mr. Burns, respondent's expert, concluded that both Messrs. Bennett and Sokol were undercompensated during the early years of petitioner.  Mr. Burns estimated that Mr. Bennett was undercompensated a total of $479,912 for the years 1983 to 1988.  However, Mr. Burns concluded that Mr. Bennett's salary increase in 1989 more than recovered this prior undercompensation.  In addition, Mr. Burns estimated that Mr. Sokol was undercompensated a total of $233,322 during the same period.  In Mr. Sokol's case, however, Mr. Burns calculated that the prior undercompensation was not recovered until sometime in 1990.

The record reveals that both Messrs. Bennett and Sokol were undercompensated as far back as 1980; however, Mr. Burns' calculations for undercompensation only go back to 1983.  Additionally, Mr. Burns calculated the amount of undercompensation using the same method he used to figure the reasonable compensation for Messrs. Bennett and Sokol in the years in issue.  We have already explained why we have declined to apply Mr. Burns' calculation to the years in issue.  We likewise find his determination of underpayment in the prior years to be low.  We find that the compensation paid to Messrs. Bennett and Sokol during the years in issue was, in part, reimbursement of compensation earned in prior years.

9.  Employer's Salary Policy As to All Employees

Courts have considered salaries paid to other employees of a business in deciding whether compensation is reasonable. Home Interiors & Gifts, Inc. v. Commissioner, 73 T.C. at 1159.  We look to this factor to determine whether Messrs. Bennett and Sokol were compensated differently than petitioner's other employees solely because of their status as shareholders.

Petitioner deducted total salaries of $4,498,328, $5,203,045, and $5,197,408 in fiscal years 1990, 1991, and 1992, respectively. As a percentage of total salaries paid, Messrs. Bennett and Sokol received 60.02 percent in 1990, 51.89 percent in 1991, and 39.45 percent in 1992, even though they constituted less than 1 percent of petitioner's employees.  Respondent contends that these figures constituted a significant proportion of petitioner's total salary costs.

These percentages do not necessarily indicate that the level of compensation paid to Messrs. Bennett and Sokol was a function of ownership rather than management responsibility.  A reasonable, longstanding, and consistently applied compensation plan, negotiated at arm's length, for example, is evidence that compensation is reasonable.  Owensby & Kritikos, Inc. v. Commissioner, 819 F.2d at 1327.

In determining whether an arm's-length negotiation occurred between petitioner and Messrs. Bennett and Sokol, we find the comparison between Messrs. Bennett's and Sokol's shareholding percentages and their respective compensations most persuasive. Messrs. Bennett and Sokol, although equal shareholders, received the following percentages of total officer salary:

| FYE | Mr. Bennett | Mr. Sokol |
|---|---|---|
| 7/30/89 | 83.55 percent | 16.45 percent |
| 7/29/90 | 75.19 percent | 24.81 percent |
| 7/28/91 | 75.19 percent | 24.81 percent |
| 8/02/92 | 100.00 percent | N/A |

Messrs. Bennett and Sokol each owned 50 percent of petitioner. Each was a board member with equal control. Messrs. Bennett and Sokol were not in any way related to one another and had no incentive or outside pressures to pay the other any amount other than that which was fair and reasonable to petitioner. Nevertheless, the amount of compensation paid to Messrs. Bennett and Sokol was not in proportion to their shareholdings. Respondent has stipulated that petitioner's redemption of Mr. Sokol's shares was not tied to his compensation. Based on all the facts, it is reasonable to conclude that Messrs. Bennett's and Sokol's compensation was bargained for at arm's length and was not a disguised dividend. See Owensby & Kritikos, Inc. v. Commissioner, supra at 1326. Indeed, Mr. Sokol sought the advice of his personal certified public accountant, Mr. Gene Barber, regarding the issue

of reasonable compensation prior to Mr. Sokol's negotiations with Mr. Bennett on this issue. Mr. Barber testified that he met with Mr. Bennett on behalf of Mr. Sokol to discuss the relative values of Messrs. Bennett and Sokol to petitioner. Following this meeting, it was Mr. Barber's opinion that the services rendered by Mr. Bennett were more valuable to petitioner than the services rendered by Mr. Sokol.[8] Based on his research, Mr. Barber recommended several different compensation plans to Mr. Sokol regarding various methods to allocate compensation between Mr. Sokol and Mr. Bennett.

## Conclusion

Based upon all the facts and circumstances of this case, we hold that the amounts that petitioner deducted in fiscal years 1989, 1990, and 1991 as compensation to Messrs. Bennett and Sokol are reasonable. Therefore, petitioner is entitled to deductions for officer compensation in the amounts claimed.

Decision will be entered

for petitioner.

---

[8]We place no reliance on Mr. Barber's opinion other than to show that Mr. Sokol sought his advice in what appears to be an arm's-length negotiation over the amount of Mr. Bennett's compensation.