T.C. Memo. 1997-467


UNITED STATES TAX COURT


H & A INTERNATIONAL JEWELRY, LTD., Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 156-95.                    Filed October 14, 1997.


David D. Aughtry and Lisa M. Lawson, for petitioner.

Eric Jorgensen, for respondent.


MEMORANDUM OPINION

PARR, Judge:  Respondent determined the following
deficiencies in petitioner's Federal income tax:

| Year | Deficiency |
|------|-----------|
| 1989 | $5,107 |
| 1990 | 4,632 |
| 1991 | 159,932 |
| 1992 | 79,454 |

All section references are to the Internal Revenue Code in

effect for the years in issue, and all Rule references are to the

Tax Court Rules of Practice and Procedure, unless otherwise

indicated. All dollar amounts are rounded to the nearest dollar, unless otherwise indicated. After concessions, the sole issue before the Court is whether the amount of executive compensation paid to Mr. Haim Haviv for 1991 and 1992 is unreasonable, and if so, what reasonable compensation is. We find the amounts paid to be unreasonable under section 162(a)(1).

Some of the facts have been stipulated and are so found. The stipulated facts and the accompanying exhibits are incorporated into our findings by this reference.

Petitioner, an international jeweler, is a Georgia corporation with its principal place of business in Dunwoody, Georgia, an unincorporated suburb of Atlanta.

General Background

H&A International Jewelry, Ltd.

Mr. and Mrs. Haviv are the sole shareholders of petitioner. Each owns 50 percent. Mr. and Mrs. Haviv contributed $500 to capital upon petitioner's incorporation. Since petitioner's incorporation, Mr. Haviv has served as its president and chairman of the board of directors, and Mrs. Haviv has served as its secretary. Petitioner has never paid any dividends.

Petitioner (1) conducts wholesale and retail sales of jewelry and precious stones, (2) appraises and insures precious stones, and (3) custom designs and repairs jewelry. Petitioner became a company unique in specialty, reputation, location, and purchasing power.

Petitioner has paid Mr. Haviv the following amounts in compensation:

| Year | Salary | Bonus/Commission | Total Compensation[1] |
|------|--------|------------------|----------------------|
| 1984 | $0 | $10,000 | $10,000 |
| 1985 | 0 | 25,000 | 25,000 |
| 1986 | 0 | 25,000 | 25,000 |
| 1987 | 12,000 | 35,000 | 47,000 |
| 1988 | 26,000 | 125,000 | 151,000 |
| 1989 | 28,000 | 95,000 | 123,000 |
| 1990 | 30,000 | 105,000 | 135,000 |
| 1991 | 40,000 | 562,000 | 601,077 |
| 1992 | 68,000 | 535,000 | 603,269 |

Petitioner's board of directors (the board), consists solely of Mr. and Mrs. Haviv. The board approved Mr. Haviv's bonuses/commissions for 1991 and 1992 at the end of each respective year.[2]

Petitioner is located in a secluded office building "quite distant" from any major highway, retail district, or mall. Petitioner does not advertise. Rather, petitioner's reputation enables it to operate by word of mouth. Petitioner purchases its jewels from diamond exchanges, mostly in Antwerp, Belgium, and Tel Aviv, Israel, as well as from side holders and wholesalers

---

[1] The parties have stipulated that Mr. Haviv's total compensation for 1991 and 1992 is $601,077 and $603,269, respectively. We note, however, that Mr. Haviv's salary and bonus/commission for 1991 and 1992 actually total $602,000 and $603,000, respectively. We find that the $923 difference for 1991 is a concession by respondent, and the $269 difference for 1992 is a concession by petitioner.

[2] Mr. and Mrs. Haviv's bonuses/commissions for 1984 through 1990 were also approved at the end of each respective year.

within the United States.[3]   The stones are then transported to petitioner's Dunwoody store and held for sale.[4]   Petitioner also accepts customer orders for desired stones and seeks them out. In 1991, petitioner had 10 employees in addition to Mr. and Mrs. Haviv:  3 salespersons, 1 jewelry repairman, 4 office staff, and 2 employees in the newly opened Oklahoma City store.  In 1992, petitioner employed an additional salesperson in its newly opened Augusta, Georgia, store.  Petitioner's employees received salary and commissions, but only Mr. and Mrs. Haviv received bonuses. Employees were compensated the following amounts for 1991:

| Name of Employee | Total Comp. | Salary | Comm./Bonus | Position |
|---|---|---|---|---|
| Haim Haviv | $601,077 | $39,077 | $562,000 | |
| Amy Haviv | 21,885 | 20,885 | 1,000 | |
| Robert Wade | 30,500 | 25,150 | 5,350 | Atlanta Sales |
| R. Lingerfelt | 17,645 | 17,501 | 144 | Oklahoma Sales |
| T.S. New | 24,384 | 24,046 | 338 | Jewelry Repairs |
| Beth Leamon | 37,305 | 21,200 | 16,105 | Atlanta Sales |
| M. Stevens | 3,691 | 3,641 | 50 | Part Time |
| Ann Hardy | 22,240 | 22,135 | 105 | Office Staff |
| Venita Smith | 19,997 | 19,960 | 37 | Bookkeeper |
| Bill Frank | 71,409 | 55,923 | 15,486 | Atlanta Sales |
| Matt Kaye | 8,110 | 8,077 | 33 | Oklahoma Sales |
| J.M. McKnight | 9,651 | 9,623 | 28 | Office Staff |
| Total | 867,894 | 267,218 | 600,676 | |

In 1992, petitioner's employees were compensated the following amounts:

---

[3]    A side holder is an individual who obtains diamonds directly from the owner of a diamond mine.

[4]    Petitioner opened stores in Oklahoma City, Oklahoma, in 1991 and Augusta, Georgia, in 1992.

| Name of Employee | Total Comp. | Salary | Comm./Bonus | Position |
|---|---|---|---|---|
| Haim Haviv | $603,269 | $68,269 | $535,000 | |
| Amy Haviv | 24,731 | 24,231 | 500 | |
| Robert Wade | 33,980 | 33,100 | 880 | Atlanta Sales |
| R. Lingerfelt | 19,757 | 19,423 | 334 | Oklahoma Sales |
| T.S. New | 2,085 | 1,157 | 928 | Jewelry Repairs |
| Beth Leamon | 28,903 | 25,250 | 3,653 | Atlanta Sales |
| Ann Hardy | 24,942 | 24,292 | 650 | Office Staff |
| Venita Smith | 22,860 | 22,231 | 629 | Bookkeeper |
| Bill Frank | 76,572 | 69,250 | 7,322 | Atlanta Sales |
| Matt Kaye | 34,890 | 34,731 | 159 | Oklahoma Sales |
| J.M. McKnight | 20,502 | 20,252 | 250 | Office Staff |
| D. Alexander | 8,329 | | 8,329 | Augusta Sales. |
| R. Cockrom | 5,381 | 5,381 | | Office Staff |
| Total | 906,201 | 347,567 | 558,634 | |

## Mr. Haviv's Skills and Qualifications

Haim Haviv was introduced to the jewelry industry at a young age by his uncle, a small collector. Mr. Haviv attended the Israeli Naval Academy and served in the Israeli Special Forces. His military background earned him trust and respect from those in the Tel Aviv diamond market. Mr. Haviv obtained a bachelor of science degree from the University of California and graduated from the Gemology Institute of America. Mr. Haviv started his career at Alman's in Atlanta as a jewelry salesman. He then became a manager in training at Citizens Jewelry Co. before he and his wife formed petitioner in 1983.

Mr. Haviv has a photographic memory with precious stones. This ability is a major asset when he makes purchases and sales. His memory enables him to keep a mental record of the identity and location of the thousands of stones in petitioner's

inventory. In addition, Mr. Haviv speaks six languages: Hebrew, French, English, Flemish, Arabic, and Italian.

Mr. Haviv's Role in the Company

Mr. Haviv makes all of petitioner's purchases. He also approves vendor invoices for payment, signs all checks, extends customer credit, and prices inventory. William L. Frank (Mr. Frank), petitioner's top salesman, also has the power to set prices for his personal sales. When Mr. Haviv is traveling, office manager Ann Hardy runs the store, although major decisions are reserved for Mr. Haviv.

Mr. Haviv's workday often extends late into the night conducting meetings, employee seminars, and strategy sessions. Except during the Christmas season he usually does not work on the weekends.

Mr. Haviv makes about eight purchasing trips abroad per year to diamond exchanges in Antwerp and Tel Aviv. He also traveled to the Orient in 1992. His linguistic ability helps him obtain low prices in foreign cities. Mrs. Haviv accompanies him about once a year. Mr. Frank traveled with Mr. Haviv two or three times between 1991 and 1992. Salesman Robert Wade has also been to the diamond exchanges.

Mr. Haviv's purchases are transported back to the Georgia store by secured delivery services. On occasion, Mr. Haviv

brings them back himself. Regardless of the means of transportation, all stones are insured during travel.

Mr. Frank joined the jewelry industry in 1973, working for Citizens Jewelry Company and D. Geller & Sons before operating his own partnership, Diamond Industries, from 1979 to 1985. He has worked for petitioner for over 5 years.

About 45 percent of petitioner's purchases are made within the United States. Domestic purchases are often made by telephone and are delivered by armored division, registered mail, or commercial carriers, depending upon the size of the order.

### The $600,000 Red Diamond Transaction

In 1991 petitioner took an order from a customer for an extremely rare .70 carat red diamond. Mr. Haviv located and purchased the diamond for $56,000. After Mr. Haviv transported the diamond into the United States, petitioner's salesperson, Beth Leamon, sold it for $600,000. Her bonus that year was $16,105.

### Dangers of the Business

Mr. Haviv has encountered increased dangers by working overseas. For instance, an individual was killed at the Tel Aviv diamond exchange, and Mr. Haviv was near an airport bombing in France. Mr. Haviv carries a gun in countries where it is legal, including the United States. Even when Mr. Haviv travels in nearby Atlanta, his work places him at a special risk. Petitioner asserts that part of Mr. Haviv's compensation is for

this added risk, which it likens to "combat-pay." Although petitioner's other employees also travel abroad and transport jewels throughout the city of Atlanta, they are not given "combat-pay." Petitioner does not employ a security guard on its premises.

### Petitioner's Salary Policy

During 1991 and 1992, Mr. Haviv determined the salaries, commissions, and bonuses for all of petitioner's employees. Salaries were fixed for the entire year. Salespersons earned commissions of 50 percent of gross profits on all sales made to their personal customers. When a sale was made to a "house customer" salespersons would typically earn commissions of 5 percent of the gross sale.[5] All "house customers" were considered to be customers of Mr. Haviv, although he was not bound by the commission structure. Petitioner had no written policy for bonuses.

### A Comparison of Salaries Paid to Mr. Haviv with Gross Income and Net Income

In 1991, Mr. Haviv's compensation was four times larger than his average compensation from the prior 3 years. In 1992, his total compensation exceeded that of 1991. For 1988-92 petitioner paid Mr. Haviv the following percentages of gross revenues:

---

[5] "House customers" are those customers who do not seek an individual salesperson. Since Ms. Leamon did not receive 5 percent of the red diamond sale price, we are at a loss to understand how this rule was applied.

|      | Gross Revenue | Mr. Haviv's Compensation | Percentage of Gross Revenue |
|------|---------------|--------------------------|-----------------------------|
| 1988 | $3,914,409    | $151,000                 | 3.9%                        |
| 1989 | 4,684,286     | 123,000                  | 2.6%                        |
| 1990 | 4,740,731     | 135,000                  | 2.9%                        |
| 1991 | 6,495,378     | 601,077                  | 9.3%                        |
| 1992 | 7,009,772     | 603,269                  | 8.6%                        |

In 1992, the compensation paid to Mr. Haviv was greater than petitioner's net income (before deduction for Mr. Haviv's compensation).  Mr. Haviv's compensation as a percentage of petitioner's taxable income for 1988-92 before the deduction for Mr. Haviv's compensation amounted to:

|      | Net Income (before deduction for Mr. Haviv's Compensation) | Mr. Haviv's Compensation | Percentage of Net Income (before deduction for Mr. Haviv's Compensation) |
|------|------------------------------------------------------------|--------------------------|--------------------------------------------------------------------------|
| 1988 | $186,208                                                   | $151,000                 | 81%                                                                      |
| 1989 | 157,044                                                    | 123,000                  | 78%                                                                      |
| 1990 | 165,883                                                    | 135,000                  | 81%                                                                      |
| 1991 | 685,988                                                    | 601,077                  | 88%                                                                      |
| 1992 | 470,991                                                    | 603,269                  | 128%                                                                     |

### The Prevailing Rates of Compensation for Comparable Positions in Comparable Concerns

Respondent used Robert Morris Associates (RMA) Annual Statement Studies to determine Mr. Haviv's reasonable compensation for 1991 and 1992 to be $207,852 and $224,313 respectively.  The RMA Study was based upon the financial statements of 10 wholesale jewelers with $5 to $10 million in annual sales.  The RMA survey for 1991 divided the officer

compensation for the 10 companies by percentage of sales:  Upper quartile, 3.2 percent; median, 2.1 percent; and lower quartile, 1.0 percent.[6]  Respondent allowed compensation of 3.2 percent of net sales.

Petitioner contends that due to Mr. Haviv's talents and market positioning, petitioner has no true competitors in the United States.  Therefore, petitioner presents what it considers "the only person remotely qualified within 100 miles of Atlanta" as a "competitor."  He has been designated as Mr. W for this trial.  Mr. W owns 100 percent of the stock of what have been designated as B Co. and C Co., each a retail jewelry store in a city in the southeast region of the United States.  At the end of the companies' fiscal year 1991, C Co was merged into B Co.

Mr. W has been in the jewelry business for 57 years and has operated C Co. and B Co. for 52 and 36 years respectively.  B Co. and C Co. have customers in Atlanta and have competed against petitioner on a few occasions in the sale of large diamonds and precious stones.

In 1991, there was an industrywide recession induced by the 10 percent luxury tax on jewelry.  See Omnibus Budget Reconciliation Act of 1990, Pub. L. 101-508, sec. 11221(a), 104 Stat. 1388, 1388-441 to 1388-442.

---

[6]     For example, 25 percent (in this survey 2) of the companies compensated their officers greater than 3.2 percent of annual sales.

Petitioner deducted Mr. Haviv's salary for 1991 and 1992 as a business expense. This produced a loss of $132,278 for 1992 which was carried back to offset income from 1989, 1990, and 1991.

## Discussion

The sole issue for determination is whether the salary and bonus paid by petitioner to its president, Haim Haviv, in 1991 and 1992 represents reasonable compensation deductible as a business expense. Petitioner contends that the entire compensation paid, $601,077 in 1991 and $603,269 in 1992, was reasonable and paid for his present and past services. Respondent, on the other hand, determined that reasonable compensation for Mr. Haviv was $207,852 and $224,313 for 1991 and 1992, respectively.

Section 162(a)(1) allows a deduction for ordinary and necessary business expenses including "a reasonable allowance for salaries or other compensation for personal services actually rendered". Compensation which is a guise for the distribution of dividends to employee-stockholders is not deductible. Sec. 1.162-7(b)(1), Income Tax Regs. Respondent's determination is presumed correct, and petitioner has the burden of proving that the amount it paid to Mr. Haviv was reasonable. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). If petitioner

proves respondent's determination erroneous, the Court must then decide the amount of compensation that was reasonable. Pepsi-Cola Bottling Co. v. Commissioner, 61 T.C. 564, 568 (1974), affd. 528 F.2d 176 (10th Cir. 1975).

The reasonableness of compensation is a question of fact to be determined from the record in each case. Estate of Wallace v. Commissioner, 95 T.C. 525, 553 (1990), affd. 965 F.2d 1038 (11th Cir. 1992). In Estate of Wallace v. Commissioner, we used the following nine factors to determine reasonableness: (1) the employee's qualifications; (2) the nature, extent, and scope of the employee's work; (3) the size and complexities of the business; (4) a comparison of salaries paid with the gross income and the net income; (5) the prevailing general economic conditions; (6) comparison of salaries with distributions to stockholders; (7) the prevailing rates of compensation for comparable positions in comparable concerns; (8) the salary policy of the corporation as to all employees; and (9) in the case of small corporations with a limited number of officers, the amount of compensation paid to the particular employee in previous years. Estate of Wallace v. Commissioner, supra at 553; see also Mayson Manufacturing Co. v. Commissioner, 178 F.2d 115, 119 (6th Cir. 1949). All the facts must be considered; no one factor is determinative. Rutter v. Commissioner, 853 F.2d 1267, 1274 (5th Cir. 1988), affg. T.C. Memo. 1986-407; Pacific Grains,

Inc. v. Commissioner, 399 F.2d 603, 606 (9th Cir. 1968), affg. T.C. Memo. 1967-7; Home Interiors & Gifts, Inc. v. Commissioner, 73 T.C. 1142, 1156 (1980). In analyzing these factors, the Court must carefully scrutinize the facts of a case in which the paying corporation is controlled by the employees to whom the compensation is paid. In such a situation, we must be convinced that the purported compensation was paid for services rendered by the employees as opposed to a distribution of earnings to them that the payor could not deduct. RTS Inv. Corp v. Commissioner, 877 F.2d 647, 650 (8th Cir. 1989), affg. per curiam T.C. Memo. 1987-98; Paul E. Kummer Realty Co. v. Commissioner, 511 F.2d 313, 315-316 (8th Cir. 1975), affg. T.C. Memo. 1974-44; Charles Schneider & Co. v. Commissioner, 500 F.2d 148, 152-153 (8th Cir. 1974), affg. T.C. Memo 1973-130; Seven Canal Place Corp. v. Commissioner, 332 F.2d 899 (2d Cir. 1964), remanding T.C. Memo. 1962-307.

Employee's Qualifications

An employee's superior qualifications for his or her position with the business may justify high compensation. See, e.g., Home Interiors & Gifts, Inc. v. Commissioner, supra at 1158; Dave Fischbein Manufacturing Co. v. Commissioner, 59 T.C. 338, 352-353 (1972).

Mr. Haviv is highly qualified to run petitioner's business as a result of his education, training, experience, and mental

attributes.  When petitioner is successful, he is the primary reason for its success.  While this factor favors petitioner, we note that there are limits to reasonable compensation "even for the most valuable employees."  Owensby  & Kritikos, Inc. v. Commissioner, 819 F.2d 1315, 1325 (5th Cir. 1987), affg. T.C. Memo. 1985-267.

Nature, Extent, and Scope of the Employee's Work

An employee's position, hours worked, duties performed, and general importance to the success of a business may justify high compensation.  Home Interiors & Gifts, Inc. v. Commissioner, supra at 1158.

Mr. Haviv essentially runs the entire business.  Among other roles, Mr. Haviv is petitioner's president, sole purchaser, and supervisor of most sales.  When Mr. Haviv is able to utilize all of his skills to purchase jewels at low prices, petitioner can generate profits.  This factor favors petitioner.

Size and Complexities of the Business

Courts have considered the size and complexity of a taxpayer's business in deciding whether compensation is reasonable.  Pepsi-Cola Bottling Co. v. Commissioner, supra at 179.  In evaluating the size of petitioner we examine its sales and net income.  See E. Wagner & Son v. Commissioner, 93 F.2d 816, 819 (9th Cir. 1937).  In considering the complexities of petitioner's business we note that petitioner does not own its own building, has only 13 employees, has retained earnings of

$115,726, and has fixed assets under $75,000. However, we also note the specialized skills required for making money in the jewelry industry and recognize that petitioner increased its sales while opening new offices in Oklahoma City, Oklahoma, in 1991 and Augusta, Georgia, in 1992.

### Comparison of Salaries Paid to Gross and Net Income

Courts have compared sales, net income, and capital value to amounts of compensation in deciding whether compensation is reasonable. Owensby & Kritikos, Inc. v. Commissioner, supra at 1325-1326; Home Interiors & Gifts, Inc. v. Commissioner, supra 1155-1156.

For 1991 and 1992, Mr. Haviv's compensation was 9.3 percent and 8.6 percent of gross revenue, respectively. However, Mr. Haviv's compensation was 88 percent and 128 percent of net income before deductions for his compensation. While considering compensation as a percentage of both gross revenue and net income is often helpful, the latter may be more probative because "it more accurately gauges whether a corporation is disguising the distribution of dividends as compensation." Owensby & Kritikos, Inc. v. Commissioner, supra at 1325-1326.[7]

---

[7] While compensation as a percentage of net income is often of minimal significance if viewed alone, it can be an appropriate factor pointing toward a conclusion that compensation paid is unreasonable. Owensby & Kritikos, Inc. v. Commissioner, 819 F.2d 1315, 1326 n.34 (5th Cir. 1987), affg. T.C. Memo. 1985-267.

In 1991, Mr. Haviv's $601,077 compensation caused petitioner's net income to plummet to one-eighth of its pre-compensation amount.  In 1992, petitioner had net income of $470,991 before compensating Mr. Haviv.  Payment of his $603,269 compensation (including his $535,000 yearend bonus) caused petitioner to suffer a net operating loss of $132,278.  We give special attention to the fact that the loss in 1992, which was caused by Mr. Haviv's bonus, was carried back to offset income from 1989, 1990, and 1991.  While this factor alone does not control the result in this case, it weighs heavily against petitioner's claim that Mr. Haviv's compensation was reasonable.

Prevailing Economic Conditions

Courts will examine whether the success of a business is attributable to prevailing economic conditions, as opposed to the efforts and business acumen of the employees.  Prevailing economic conditions may affect a business' performance and indicate the extent, if any, of the employees' effect on the company.  Mayson Manufacturing Co. v. Commissioner, supra at 119-120.  Adverse economic conditions, for example, tend to show that an employee's skill was important to a company that grew during hard times.

Petitioner asserts that both a general recession and an industry-specific recession induced by the luxury tax forced Mr. Haviv to work harder to increase gross sales by approximately

$2,200,000 and $500,000 in 1991 and 1992, respectively.  We agree.

Comparison of Salaries Paid With Dividends to Shareholders

The failure to pay more than minimal dividends may suggest that reported compensation actually is (in whole or in part) a dividend.  Owensby & Kritikos, Inc. v. Commissioner, supra at 1323-1324; Charles Schneider & Co. v. Commissioner, 500 F.2d at 151-152.  Corporations, however, are not required to pay dividends.  Indeed, shareholders may be equally content with the appreciation of their stock caused, for example, by the retention of earnings.  Owensby & Kritikos, Inc. v. Commissioner, supra; Home Interiors & Gifts, Inc. v. Commissioner, 73 T.C. at 1162.  Nevertheless, a corporation's failure to pay dividends may be a factor in determining the reasonableness of officer compensation.

Since its incorporation in 1983, petitioner has never paid a dividend to shareholders.  The board of directors, which has the authority to pay dividends and award bonuses, has always consisted solely of Mr. and Mrs. Haviv, who are also the only employees ever to receive yearend bonuses.

Prevailing Rates of Compensation for Comparable Positions in Comparable Companies

Respondent's regulations provide that:

It is, in general, just to assume that reasonable and true compensation is only such amount as would ordinarily be paid for like services by like enterprises under like circumstances.   ***[Sec. 1.162-7(b)(3), Income Tax Regs.]

Both parties testified to the difficulty of finding a business comparable to petitioner.  In determining that $207,852 and

$224,313 constituted reasonable compensation for 1991 and 1992, respectively, respondent relied solely upon statistics from the RMA survey.[8]  Respondent accepts the 10 jewelers used in the survey as petitioner's competitors.  However, in an introduction to its studies, RMA cautions that its data should be used "only as general guidelines and not as absolute industry norms."  The RMA guidelines explain that companies used are not selected "by any random or statistically reliable method" and that a relatively small industry sample (such as the 10 companies used for wholesale jewelers) may increase the chances that such data do not fully represent an industry.

We have other reservations about the manner in which respondent applied the survey statistics.[9]  Respondent used the 3.2-percent figure (derived from the 1991 survey) for 1992 also, despite the fact that the 1992 RMA survey did not release such figures for 1992, while the 1993 survey provided a much higher corresponding percentage of 6.0.  In addition, the RMA wholesale jewelry survey does not account for all aspects of petitioner's

---

[8]     According to the RMA survey, respondent's determinations would place petitioner just below the upper quartile of wholesale jewelry companies as distinguished by levels of officer compensation.  While data from RMA surveys have been accepted by this Court in some instances, on other occasions its reliability in determining reasonable compensation has been questioned.  See PMT, Inc. v. Commissioner, T.C. Memo. 1996-303; Lumber City Corp. v. Commissioner, T.C. Memo. 1996-171; Hendricks Furniture, Inc. v. Commissioner, T.C. Memo. 1988-133.

[9]     Respondent's capping reasonable compensation at 3.2 percent of petitioner's net sales ignores RMA figures from 1992 and 1993.

business such as jewelry sold at retail, yet that is the only RMA survey respondent elected to use. Despite the inherent flaws in the RMA survey, respondent relied solely upon the RMA statistics without presenting any witnesses, expert or otherwise, to bolster respondent's figures. Respondent has offered no evidence to show that the 10 companies used in the survey to determine a "reasonable" compensation for Mr. Haviv are even comparable to petitioner. Thus, we find respondent's figures to be arbitrary.

We also find petitioner's figures lack credibility. Admitting that a true competitor does not exist, petitioner compares itself to Mr. W's company (which we will refer to as simply B Co. despite the fact that it was actually two companies, B Co. and C Co., before 1991) by virtue of the fact that they are both involved in selling wholesale and retail jewelry and precious stones, appraisal and insurance of precious stones, as well as custom design and jewelry repairs. However, the percentage of business allocated to each aspect of its operations varied greatly between companies. For example, wholesale trade accounted for over 50 percent of petitioner's business, but for only 10 percent of B Co.'s total profits.

However there are many similarities that weigh in petitioner's favor. B Co.'s net sales figure for 1991 was $5,523,835 compared to petitioner's $6,495,378, and for 1992 was $6,792,055 compared to petitioner's $7,009,772. B Co.'s net income was $22,211 for 1991 and negative $220,395 for 1992. Mr.

W was compensated $751,000 for 1991 compared to Mr. Haviv's $601,077 and $1,016,000 for 1992 compared to Mr. Haviv's $603,269.  Like Mr. Haviv, Mr. W was also the primary shareholder of his company.  But, unlike Mr. Haviv, he operated the company as an S corporation.  B Co.'s sales were slightly lower for 1991 and 1992, but its gross profit percentage was approximately double that of petitioner.

While Mr. W's compensation statistics indicate that respondent's compensation allocations may be less than the value of Mr. Haviv's services, we decline to accept the compensation of one employee from one company in the industry as a benchmark for reasonableness.

Petitioner presented two certified public accountants as witnesses who each testified that Mr. Haviv's compensation was reasonable for the services rendered.  Mr. Randy Galanti concluded that Mr. Haviv's "compensation was in the range of reasonable based upon the compensation that could have been reasonably paid for just the first four functions [performed by Mr. Haviv]:"

|  | 1991 | 1992 |
|---|---|---|
| Purchasing function | $106,598 | $151,270 |
| Sales function | 451,027 | 393,791 |
| Chief executive officer | 413,553 | 446,367 |
| Chief financial officer | 406,454 | 433,337 |
| Reasonable Compensation for above functions | $1,377,632 | $1,424,765 |

Mr. Galanti's reasoning is flawed.[10]  The "reasonable" salary used for each title is based upon a full-time position.  It is most unlikely that Mr. Haviv could have worked 160 hours per week.

In addition, in considering whether a reasonable investor would have approved of compensation to Mr. Haviv of over $600,000 per year, Mr. Galanti focused on Mr. and Mrs. Haviv's return on their $500 investment since 1983.  That calculation resulted in an annualized growth rate of 72 percent.  We recognize the caution with which such a ratio must be examined.[11]  Return on equity is a much more accurate indicator of company performance. (See our discussion, infra.)  As opposed to the 72 percent figure, petitioner's return on equity year by year from 1988 to 1992 was 35 percent, 21 percent, 16 percent, 36 percent, and -51 percent respectively.  Since a board makes its bonus decisions from year to year, return on equity may also be examined from year to year.  Thus, a strong return in 1 year does not guarantee board approval of bonuses in the next year, especially if there are financial reverses the second year.

---

[10]    Mr. Galanti believes that it would have been reasonable to pay Mr. Haviv $1,377,632 in 1991 for a company that earned $84,911 and $1,424,765 in 1992 for a company that lost $132,278.

[11]    For example, if Mr. and Mrs. Haviv had invested $1,000 in 1983 their annualized return on investment would have been 36 percent whereas a smaller $250 investment would have given them an annualized return of 144 percent.

Petitioner's other witness, Mr. Stephen Gross, similarly examined the "reasonableness" of petitioner's figures by adding up the salaries of full-time positions for each of the different roles Mr. Haviv performed.  Finding no actual competitors of petitioner, Mr. Gross also placed improper reliance upon the RMA survey used by respondent.

Employer's Salary Policy as to All Employees

Courts have considered salaries paid to other employees of a business in deciding whether compensation is reasonable.  Home Interiors & Gifts, Inc. v. Commissioner, 73 T.C. at 1159.  We look to this factor to determine if Mr. Haviv was compensated differently than petitioner's other employees solely because of his status as a shareholder.

Mr. Haviv earned $601,077 in 1991 and $603,269 in 1992 compared to petitioner's second highest paid employee who made $71,409 and $76,572, respectively.  In 1991, the total compensation for petitioner's nonstockholder employees totaled $244,933.  Mr. Haviv's total compensation was 2.4 times the total compensation for all of petitioner's nonshareholder employees combined.  In 1992, Mr. Haviv's total compensation was 2.1 times the total compensation of all of petitioner's nonshareholder employees.

A reasonable, longstanding, and consistently applied compensation plan negotiated at arm's length, often provides evidence that compensation paid pursuant to that plan is

reasonable.  Owensby & Kritikos, Inc. v. Commissioner, 819 F.2d at 1327-1328.  In 1991 and 1992, Mr. Haviv determined the compensation amounts for all of petitioner's employees.  There were no written policies for making such determinations.  Salaries for Mr. and Mrs. Haviv were approved by the board of directors at the annual meeting preceding each year.  Yearend bonuses were also approved at the annual meeting.  Mr. and Mrs. Haviv were the only employees ever to receive yearend bonuses.  Mr. Haviv received yearend bonuses of $95,000, $105,000, $562,000, and $535,000 for 1989, 1990, 1991, and 1992, respectively.  Such substantial bonuses, declared at yearend when corporate earnings are determinable, may indicate the existence of disguised dividends.  Id. at 1329.  Disguised dividends are even more probable when, as is the case with petitioner, the "corporation has a history of distributing as compensation to its shareholder-employees the bulk of its profits." Id.; Estate of Wallace v. Commissioner, 95 T.C. at 557.[12]

Petitioner asserted that it paid Mr. Haviv less compensation for his sales than it would have under petitioner's fixed commission rate of 50 percent of profits.  Petitioner asserted that under its commission policy, Mr. Haviv would have been entitled to a commission of $272,000 on the sale of the red diamond in 1991.  We consider the commission that a

_____

[12]     As noted, in 1991 and 1992, petitioner paid 88 percent and 128 percent of net income to Mr. Haviv in the form of compensation.

nonshareholder-employee would have earned on this sale to be an appropriate factor in measuring Mr. Haviv's compensation for 1991. However, petitioner did not establish the total amount of sales for which Mr. Haviv was directly responsible. Since Mr. Haviv was an employee of petitioner, it was improper to credit him with all of the "house sales" as if they were his own. Thus, we disagree with petitioner's assertion that an arm's-length value for Mr. Haviv's selling position was 50 percent of profits from all sales to "house customers". As petitioner admits, the sale of the red diamond was an extraordinary transaction, as there were only five in the world. Mr. Haviv took a specific order for a red diamond and then was able to purchase one at the Antwerp exchange. This diamond was then sold by one of petitioner's salespersons and petitioner made $546,000 profit. Unlike traditional "house sales", where customers purchase from petitioner's salespersons after hearing of petitioner's reputation, Mr. Haviv played an unusually active role in the sale of the red diamond. In sales where Mr. Haviv lacked such involvement, we find it was improper for petitioner to have credited him with a "house sale". Therefore, since 1992 did not contain such an extraordinary sale as the red diamond, Mr. Haviv's total compensation for 1992 might have been significantly less than what it was for 1991 if based upon commissions.

Petitioner asserted that an arm's-length rate for purchasing commissions was 3 percent. That is, were it not for Mr. Haviv's services, it would have had to pay an outsider 3 percent of all stones purchased. During the deposition, Mr. W, petitioner's "nearest competitor", made no mention of paying a 3-percent commission on his purchases. Regardless of what the "outside rate" might have been, Mr. Haviv was an employee of petitioner, and petitioner made the business decision to employ a chief executive officer who could also perform the purchasing function. We are not persuaded that Mr. Haviv's reasonable compensation may properly be determined based upon what it would cost to employ a full-time chief executive officer, a full-time chief operating officer, a full-time purchaser, and a full-time salesman.

Moreover, because Mr. and Mrs. Haviv were the sole shareholders, Mr. Haviv's compensation was not bargained for at arm's length. We therefore must inquire whether an independent investor would have approved of the compensation levels paid to Mr. Haviv during the subject years. See Owensby & Kritikos, Inc. v. Commissioner, supra at 1326-1327.

As the taxpayer's experts testified, a corporation may choose to retain its earnings to fuel future growth. An investor may obtain a return on his investment through either dividends or appreciation in the value of his stock. Id. at 1326. Thus, the Court looks not only at a corporation's dividend practices, but

also at the total return the corporation is earning for its investors.  Id.  A prime indicator of the return a corporation is earning for its investors is its return on equity.[13]  See also id. at 1327.  Petitioner's return on equity for the years 1988 to 1992 was as follows:

| | Return on Equity | | 1988-1992 | | |
|---|---|---|---|---|---|
| Taxable Year Ended | 12/31/88 | 12/31/89 | 12/31/90 | 12/31/91 | 12/31/92 |
| Shareholder Equity Beg. of Yr. | $113,753 | $136,289 | $165,333 | $172,363 | $235,066 |
| net income | 40,317 | 29,045 | 26,521 | 62,703 | -119,340 |
| Return on Equity | 35% | 21% | 16% | 36% | -51% |

An independent investor would not be satisfied with the awarding of a yearend bonus worth over seven times an employee's salary, a return on equity of negative 51 percent.

Another benchmark for reasonableness is the value of an employee to his company.  We find it hard to believe that Mr. Haviv could be worth, in 1 year, more than petitioner has cumulatively earned under Mr. Haviv's 8 years of stewardship.

Based upon all of the facts, it is reasonable to conclude that Mr. Haviv's compensation was neither bargained for nor reached at arm's length.  Together with other facts and circumstances, this is a strong indication that the bonuses paid to Mr. Haviv were a disguised dividend.  See id. at 1326 n.34.

---

[13]    Return on equity is calculated after deducting all amounts paid as compensation.

The Amount of Compensation Paid to Mr. Haviv in the Previous Years.

Petitioner contends that part of Mr. Haviv's payment for 1991 and 1992 was for services rendered in prior years. Under some circumstances prior services may be compensated for in a later year. Lucas v. Ox Fibre Brush Co, 281 U.S. 115 (1930); Estate of Wallace v. Commissioner, 95 T.C. at 553. However, it is incumbent on a taxpayer claiming that part of the payment to an officer in the current year is for services rendered for prior periods to show that the officer was not sufficiently compensated in the prior year and that in fact the current year's compensation was to compensate for that underpayment. Pacific Grains, Inc. v. Commissioner, 399 F.2d at 606; Home Interiors & Gifts, Inc. v. Commissioner, 73 T.C. at 1156.

There is evidence in the record to show that Mr. Haviv may not have been paid in full for the services he rendered to petitioner in the years 1983 to 1987. Before creating petitioner, Mr. Haviv had worked for several years for other employers in the jewelry industry. Mr. Haviv was the sole purchaser, supervised most sales, and traveled overseas for petitioner. The record shows that petitioner paid Mr. Haviv $10,000, $25,000, $25,000, and $47,000, in 1984, 1985, 1986, and 1987, respectively. However, we do not find any evidence, with the exception of Mr. Haviv's unsupported testimony, that Mr. Haviv's compensation in 1991 and 1992 was to compensate for his underpayment of prior years. The minutes from the shareholder

meetings of December 26, 1991, and December 30, 1992, make no reference to Mr. Haviv's efforts outside of the respective year at issue.  The minutes from the 1991 meeting authorize a $562,000 bonus to Mr. Haviv "for performance rendered during 1991 and for the superior efforts associated with the `red' diamond and for the day to day management of the Company."   The minutes for the 1992 meeting also demonstrate that the board of directors did not intend to compensate Mr. Haviv for prior years' underpayment:

> The President presented tentative operating statistics for the year which reflected 10% increase in sales (20% if the prior year extraordinary sales were eliminated), a strengthening of the gross profit percentage and a moderate increase in operating costs.  This all occurred in a recessionary economy.  The Board stated the President was performing beyond their expectations and congratulated him for his extraordinary efforts. Resolved, that for performance rendered during 1992 for the above stated reasons, the Board authorizes the following bonuses: Haim Haviv $535,000, Amy Haviv $500.

We find that petitioner did not intend Mr. Haviv's compensation for 1991 and 1992 to include compensation for prior years.

Upon scrutinizing all of the facts and circumstances presented here before us, we find petitioner's compensation deduction unreasonable.  We also find that respondent's absolute reliance on the RMA survey was erroneous.  On the basis of the entire record, we hold that $429,000 for 1991 and $305,000 for 1992 constituted reasonable compensation to Mr. Haviv for services rendered.

Decision will be

entered under Rule 155.